In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 22-2806

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

*Plaintiff-Appellant,*

*v.*

VILLAGE AT HAMILTON POINTE LLC, d/b/a
Hamilton Pointe Health and Rehabilitation
Center; d/b/a Hamilton Pointe Assisted
Living Center; d/b/a The Cottages at
Hamilton Pointe and TENDER LOVING CARE
MANAGEMENT, LLC, d/b/a TLC
Management,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Evansville Division.
No. 3:17-cv-00147 — **Richard L. Young**, *Judge.*

———————————

ARGUED SEPTEMBER 13, 2023 — DECIDED MAY 9, 2024

———————————

Before FLAUM, RIPPLE, and SCUDDER, *Circuit Judges.*

RIPPLE, *Circuit Judge*. The Equal Employment Opportunity Commission (the "EEOC" or "Commission") brought this Title VII employment discrimination action, 42 U.S.C. §§ 2000e-2, e-5, on behalf of black employees of Village at Hamilton Pointe, LLC ("Hamilton Pointe"), which operates a long-term care facility located in Newburgh, Indiana. This institution provides nursing, rehabilitation, and assisted living services. The Commission also named as a defendant Tender Loving Care Management, LLC, d/b/a TLC Management ("TLC"), which provides a variety of services to Hamilton Pointe. Among other matters not immediately relevant to this appeal, the Commission alleged that Hamilton Pointe and TLC had subjected the employees to racial harassment while performing their duties.

The district court granted TLC's motion for summary judgment with respect to the claims of some of the employees. The court held that, on the record before it, TLC could not be considered an employer within the meaning of Title VII of the Civil Rights Act. The court also granted Hamilton Pointe's motion for partial summary judgment with respect to the claims of forty employees. Seven remaining employees proceeded to a jury trial. The jury awarded damages to one employee. The EEOC now appeals the grant of summary judgment for TLC, the grant of partial summary judgment for Hamilton Pointe, and the jury's verdict.

We affirm the judgment of the district court. The district court correctly granted partial summary judgment on the claims of the fifteen class members before us on appeal. It committed no reversible error during the trial of the remaining racial harassment claims. Finally, the district court

correctly held that TLC was not an employer within the meaning of Title VII.

## BACKGROUND

The EEOC brought this action against Hamilton Pointe and TLC in the United States District Court for the Southern District of Indiana. It sued on behalf of fifty-two current and former black employees including seven charging parties named in the complaint.[1] The complaint alleged, among other matters,[2] that the defendants had subjected the named charging parties and a class of current and former employees to severe or pervasive harassment because of their race and therefore violated Title VII.[3]

As this case comes to us, it presents three distinct issues, each cast in a separate procedural posture. For ease of reading, we will first discuss the district court's grant of summary judgment to Hamilton Pointe on the racial harassment claims of most of the named employee-claimants. We will then discuss the trial of the claims of the remaining named claimants. Finally, because one of the claimants received a damages award at the trial, we will evaluate the EEOC's view that TLC can be considered a joint employer and therefore can be liable for the satisfaction of that judgment.

---

[1] Before Hamilton Pointe filed its motion for partial summary judgment, the EEOC agreed to remove five class members from the suit.

[2] The EEOC also alleged disparate treatment claims that are not challenged on this appeal.

[3] The district court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. § 2000e-5(f)(1).

## DISCUSSION

### A

#### 1.

We begin by setting forth the established legal principles that must guide our evaluation of the district court's grant of summary judgment on the claims of several named employees. We will then apply these principles to the district court's decision with respect to each of the fifteen employees whose claims the EEOC asks us to review.

The standards governing the grant of summary judgment are well established. We review the district court's grant of summary judgment de novo and, like the district court, take the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Uebelacker v. Rock Energy Coop.*, 54 F.4th 1008, 1010 (7th Cir. 2022). "An inference is not reasonable if it is directly contradicted by direct evidence provided at the summary judgment stage, nor is a 'conceivable' inference necessarily reasonable at summary judgment." *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 869, 876 (7th Cir. 2021) (quoting *Cont'l Cas. Co. v. Nw. Nat'l. Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005)). We will affirm the district court's grant of summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We may affirm a district court's grant of summary judgment on any basis that is apparent from our review of the record, provided that the issue was raised and the losing parties had a fair opportunity to contest it in the district court." *REXA, Inc. v. Chester*, 42 F.4th 652, 662 (7th Cir. 2022).

The substantive standards for establishing a claim of a hostile work environment based on race are also well established. The EEOC must establish that (1) the employee was subject to unwelcome harassment; (2) the harassment was based on the employee's race; (3) "the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment"; and (4) there is a basis for employer liability. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018). We first turn to a closer examination of these elements.

In establishing that harassment was based on race, the EEOC "need not show that the complained-of conduct was explicitly racial[] but must show it had a racial character or purpose." *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011). This practical approach recognizes that "forms of harassment that might seem neutral in terms of race … can contribute to a hostile work environment claim if other evidence supports a reasonable inference tying the harassment to the plaintiff's protected status." *Cole v. Bd. of Trustees of N. Ill. Univ.*, 838 F.3d 888, 896 (7th Cir. 2016). "Whether the inference is appropriate depends on the circumstances of the case; … superficially neutral events are properly considered as part of 'the entire context of the workplace.'" *Id.* (quoting *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1046 (7th Cir. 2002)).[4] Although a connection between the harassment and the plaintiff's protected status need not be explicit, there must be *some* connection; "not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because

---

[4] *See also Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 648 (7th Cir. 2011) (evidence of the use of the word "monkey" over the intercom provided without context did not support a claim for race-based harassment).

the complaining employee belongs to a racial minority." *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863 (7th Cir. 2005); *see also Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1159 (7th Cir. 2014).

A plaintiff must show that the alleged harassment was so severe or pervasive that it altered the conditions of his employment. *Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 401 (7th Cir. 2010). When determining whether the harassment was so severe or pervasive, we employ both an objective and a subjective test. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998); *see also EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 625 (7th Cir. 2018). The subjective beliefs of an employee are not sufficient alone to meet this standard. *Yancick*, 653 F.3d at 548.[5] "[T]he environment must be one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 566 (7th Cir. 2004) (quotations omitted).

To determine whether the harassing conduct created an environment that was "objectively hostile, we consider the totality of the circumstances, including: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Alamo v. Bliss*, 864 F.3d 541, 549–50 (7th Cir. 2017) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23

---

[5] "[I]f the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed." *Mlynczak v. Bodman*, 442 F.3d 1050, 1058 (7th Cir. 2006) (quoting *Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 841–42 (7th Cir.1996)).

(1993)). *See also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). "Offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment." *Passananti v. Cook Cnty.*, 689 F.3d 655, 667 (7th Cir. 2012).

Because harassment need not be both severe *and* pervasive to establish a hostile work environment, "[a] 'severe episode' that occurs 'as rarely as once' or a 'relentless pattern of lesser harassment'" can be sufficient to meet the standard. *Alamo*, 864 F.3d at 550 (quoting *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 951 (7th Cir. 2005)). Again, in assessing the impact of the conduct under this totality of the circumstances approach, we consider "the specific circumstances of the working environment and the relationship between the harassing party and the harassed." *Robinson v. Sappington*, 351 F.3d 317, 330 (7th Cir. 2003). The context is crucial to an accurate appreciation of the impact a harasser's conduct had on the work environment. *Scaife v. United States Dep't of Veterans Affs.*, 49 F.4th 1109, 1116 (7th Cir. 2022). We "have repeatedly treated a supervisor's use of racially toxic language in the workplace as much more serious than a co-worker's." *Gates v. Bd. of Educ. of the City of Chic.*, 916 F.3d 631, 638 (7th Cir. 2019). Further, the conduct of a direct supervisor merits "more weight in the analysis" than the conduct of an indirect supervisor whose conduct in turns merits "more weight than an employee's co-equal." *Scaife*, 49 F.4th at 1117.[6]

---

[6] The EEOC contends (both with respect to the claims dismissed on summary judgment and the claims that proceeded to trial) that nurses were the supervisors of the CNAs. It is clear that individuals with these nurses'

(continued … )

"[T]he more remote or indirect the act claimed to create a hostile working environment, the more attenuated the inference that it had an effect on the terms and conditions of the plaintiff's workplace." *Yancick*, 653 F.3d at 545. Thus "[w]hile certainly relevant to the determination of a hostile work environment claim, when harassment is 'directed at someone other than the plaintiff, the impact of [such] second-hand harassment is obviously not as great as the impact of harassment directed at the plaintiff.'" *Smith*, 388 F.3d at 567 (internal quotations marks and citation omitted). For this same reason, remarks addressed "directly to the plaintiff weigh heavier than when a plaintiff hears them secondhand." *Scaife*, 49 F.4th at 1116. For example, in *Johnson*, we divided the racially charged language by the plaintiffs' supervisors into three categories. 892 F.3d at 901–03. First, comments made directly to plaintiffs carried the most weight. *Id.* Second, direct comments made to non-plaintiffs "carr[ied] less weight." *Id.* at 902. Nevertheless, such remarks still constituted evidence that the same supervisors made racially derogatory comments to other employees in the same positions and therefore, this evidence tended to make it more likely that the discrimination was pervasive. *Id.* And third, comments that the plaintiffs "were told supervisors made" which were characterized as the "weakest evidence." *Id.* Although these last comments may be admissible to show "that employees understood their environment to be one in which derogatory statements were pervasive, … it

---

limited authority are not "supervisors" as that term has been employed by the Supreme Court in discussing employer liability. *See infra* pp. 13–14. However, the behavior of nurses who have some authority over the class members, even if they do not meet the definition of a supervisor for considering employer liability, deserve greater weight than the behavior of another co-worker on substantially equal footing with the employee.

would be for the district court to determine whether these comments were more prejudicial than probative." *Id.* at 903. We "caution[ed] against elevating workplace rumors to evidence of a hostile work environment, although coupled with other evidence this testimony might have relevance in a hostile work environment claim." *Id.*

Finally, there is no requirement that severe or pervasive harassment stem from co-worker or supervisor conduct. *See Dunn v. Washington Cnty. Hosp.*, 429 F.3d 689, 691 (7th Cir. 2005). An employer may be liable for a hostile work environment originating from the harassing conduct of third parties, *Costco*, 903 F.3d at 624, including the conduct of nursing home residents. *See Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 441 (7th Cir. 2010). In such a situation, we do not consider the employer's control over the third party, but only the impact of the third-party harassment on the employee's working environment. *See Dunn*, 429 F.3d at 691.

Establishing severe or pervasive harassment does not ensure, by itself, the success of a hostile work environment claim. An employer's legal liability for racial harassment also "depend[s] on the status of the harasser." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." *Id.* This negligence may occur either in failing to discover or in failing to remedy the harassment. *Cole*, 838 F.3d at 898. *See Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1029 (7th Cir. 2004) (holding that an employer was not negligent in failing to discover that an employee was subjected to a racially harassing work environment when the employee did not report his concerns to his supervisors pursuant to the employer's anti-harassment

policy). In sum, an employer is liable for non-supervisor harassment only if it has been "negligent in discovering or remedying the harassment." *Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 866 (7th Cir. 2013).

Because an employer is "not omniscient, it must have notice or knowledge of the harassment before it can be held liable." *Durkin v. City of Chi.*, 341 F.3d 606, 612 (7th Cir. 2003). The employee must show that the employer had "enough information so that a reasonable employer would think there was some probability" of the harassment. *Id.* This notice must be "given to either someone with authority to take corrective action or, at a minimum, someone who could 'reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it.'" *Lambert*, 723 F.3d at 866 (quoting *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1037 (7th Cir. 1998)).

Generally, when deciding "whether an employer had notice of harassment, we first determine whether the employer has designated a channel for complaints of harassment." *Parkins*, 163 F.3d at 1035. "If the employer has established a set of procedures for reporting complaints about harassment," we expect an employee "to follow that policy in order to provide notice sufficient for the employer to be held responsible, unless the policy itself is subject to attack as inadequate." *Lambert*, 723 F.3d at 867. By reporting harassment to the "point person" identified by the employer for receiving complaints, an employee satisfies the notice requirement. *Parkins*, 163 F.3d at 1035. If an employer provides multiple channels for reporting harassment, such as a point person and a separate hotline, an employee need only use one to put the employer on notice. *See Valentine v. City of Chi.*, 452 F.3d 670, 679 (7th Cir. 2006).

But an employee "need not specifically comply with the company's internal procedure [so long as] the employer is adequately put on notice of the prohibited harassment." *Yancick*, 653 F.3d at 549. When the channel for reporting harassment is unclear or inaccessible, an employee's complaints to non-management only put the employer on notice if the employee reasonably believed the recipient had the power "to set in motion the process of bringing his complaints to the attention of someone with authority to remedy them." *Lambert*, 723 F.3d at 868. We have applied this reasonableness standard when the employer's policy states that harassment should be reported to supervisors, but there is a dispute as to whether the recipient of the complaint should be considered a supervisor for the purposes of that policy. *See Bombaci v. J. Cmty. Pub'g. Grp., Inc.*, 482 F.3d 979, 984 (7th Cir. 2007).

An employer has constructive notice of harassment if the harassment is sufficiently pervasive and obvious. *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 507 (7th Cir. 2004). In *Wilson v. Chrysler Corp.*, 172 F.3d 500, 509 (7th Cir. 1999), we held that, although the employer contested whether the plaintiff sufficiently complained about the harassing conduct, the employer nevertheless had constructive notice of her harassment because much of the harassment to which she was subjected "was public and deliberately exhibitionist." We concluded that the employer could not escape liability on the grounds that the management team was "oblivious to such openly hostile behavior." *Id.* In *Rhodes*, however, we determined that the employer did not have constructive notice of the pervasive presence of pornography prevalent in the workplace for several years where the record revealed that the highest-ranking employee at the facility disposed of pornographic magazines whenever he saw them, that offending employees took

measures to conceal their viewing of pornographic videos from supervisors, and that no employee complained of the pornographic magazines or videos. 359 F.3d at 507.

We also note that an employer's knowledge of an incident of harassing behavior is insufficient to establish a basis for employer liability unless that behavior puts the employer on notice of the existence of an actionable hostile work environment. *Bombaci*, 482 F.3d at 985 n.2 (stating that managers' knowledge of harassers' sexual jokes and inappropriate comments to others did not constitute employer notice of sexual harassment suffered by plaintiff because the incidents "did not come close to creating an actionable work environment"); *Rhodes*, 359 F.3d at 507 (holding that plaintiff's complaint to management about one pornographic picture taped to her locker does not impute knowledge to employer of prevalent pornographic magazines and television used for viewing pornography); *McPherson v. City of Waukegan*, 379 F.3d 430, 441 (7th Cir. 2004) (holding that harasser's sexually inappropriate questions to female staff heard by office manager and supervisor did not put employer on notice that employee would commit sexual assault in the future because the questions did not create an actionable hostile work environment).

An employer is not liable for co-worker harassment if, upon becoming aware of the situation, it took "prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Cole*, 838 F.3d at 898 (quoting *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 636 (7th Cir. 2009)). "[T]he emphasis of Title VII in this context is not on redress but on the prevention of future harm." *Lapka v. Chertoff*, 517 F.3d 974, 984 (7th Cir. 2008). For instance, "in some circumstances, creating physical separation and minimizing time

worked together are steps reasonably likely to end harass-
ment." *Sutherland v. Wal-Mart Stores, Inc.*, 632 F.3d 990, 995
(7th Cir. 2011) (holding that the employer's responses—repri-
manding the harasser, limiting overlap between the har-
asser's and the victim's schedules, and reassigning the victim
to another workstation when scheduled to work with the har-
asser—were reasonably likely to end the harassment).

This same negligence standard applies to hostile work en-
vironment claims based on third-party conduct. *Costco*, 903
F.3d at 627. "[I]t makes no difference whether the person
whose acts are complained of is an employee, an independent
contractor, or for that matter a customer." *Dunn*, 429 F.3d at
691. "The employer's responsibility is to provide its employ-
ees with nondiscriminatory working conditions. The genesis
of inequality matters not; what does matter is how the em-
ployer handles the problem." *Id.*

If the harasser is a "supervisor," the employer is strictly
liable and can only escape that liability if no tangible employ-
ment action had been taken, and the employer establishes, "as
an affirmative defense, that (1) the employer exercised rea-
sonable care to prevent and correct any harassing behavior
and (2) that the plaintiff unreasonably failed to take ad-
vantage of the preventive or corrective opportunities that the
employer provided." *Vance*, 570 U.S. at 424. "[A]n employee
is a 'supervisor' for purposes of vicarious liability under Title
VII if he or she is empowered by the employer to take tangible
employment actions against the victim." *Id.* "In other words,
a supervisor is the one with the 'power to directly affect the
terms and conditions of employment. This power includes the
authority to hire, fire, promote, demote, discipline or transfer

a plaintiff.'" *Johnson*, 892 F.3d at 905 (quoting *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 930 (7th Cir. 2017)).[7]

This court and the Court of Appeals for the Fifth Circuit have applied these basic principles to situations bearing some similarity to the ones before us today. In *Chaney v. Plainfield*, 612 F.3d 908, 915 (7th Cir. 2010), we held that the employer's policy of honoring residents' racial preferences in assigning caregivers not only contributed to a racially hostile work environment but was the "principal source" of that hostility. In that case, Chaney, a black certified nursing assistant ("CNA") was confronted with work assignment sheets stating that a particular resident "Prefers No Black CNAs." *Id.* at 910. She honored this directive for fear of termination and also tolerated another patient's refusal of her care, and a third patient's racial prejudice relayed through a co-worker. *Id.* The employer's "practice of honoring the racial preferences of residents was accompanied by racially-tinged comments and epithets from co-workers." *Id.* at 911.[8] Although the use of racial epithets by co-workers ceased after the CNA reported them to her supervisor, the employer's "racial preference policy remained in place and continued to surface in conversations with other employees." *Id.* It was, we concluded, "the principal source of the racial hostility in the workplace." *Id.* at 915.

We had "no trouble finding that a reasonable person would find [this] work environment hostile or abusive." *Id.* at 912. "[T]hrough its assignment sheet that unambiguously,

---

[7] *See supra* note 6.

[8] One white co-worker called her a "black bitch" and another asked the plaintiff why their employer hired "all of these black n——[.]" *Chaney*, 612 F.3d at 911.

and daily, reminded Chaney and her co-workers that certain residents preferred no black CNAs," the employer "foster[ed] and engender[ed] a racially-charged environment." *Id.* Although the worst racial insults from co-workers ceased after the CNA complained, we determined that there was still ample basis for employer liability as the racial preference policy and constant reminders of that policy remained. *Id.*

Notably, in *Chaney*, the employer did not deny that it maintained a policy of fulfilling patients' racial preferences but argued that its policy was permitted under Title VII. *Id.* at 912–14. The employer presented its policy as the only means by which it could avoid being forced to choose between discharging racially hostile residents and "exposing black employees to racial harassment from the residents and, in turn, exposing itself to hostile workplace liability." *Id.* at 914. We determined this justification to be untenable. First, we noted that it was well established in this circuit and elsewhere in the federal courts that "the desire to cater to the racial preferences of customers was no defense under Title VII to treating employees differently on the basis of race." *Id.* at 913. We saw no reason to treat a health care facility differently from any other employer. Moreover, we continued:

> [W]ithout resorting to discharging residents, a long-term care facility confronted with a hostile resident has a range of options. It can warn residents before admitting them of the facility's nondiscrimination policy, securing the resident's consent in writing; it can attempt to reform the resident's behavior after admission; and it can assign staff based on race-neutral criteria that minimize the risk of conflict. [The

employer] could have, for instance, advised its employees that they could ask for protection from racially harassing residents. That way, [the employer] would not be imposing an unwanted, race-conscious work limitation on its black employees; rather, it would be allowing all employees to work in a race-neutral, non-harassing work environment, as is commonly expected of employers. And even if all these efforts do not guarantee full racial harmony, they exemplify reasonable measures that an employer can undertake to avoid liability for known workplace harassment.

*Id.* at 915 (internal citations omitted). Instead of pursuing any of these options, the employer "told Chaney that it was excluding her from work areas and residents solely on account of her race, thereby creating a racially charged workplace that poisoned the work environment." *Id.*

As the district court in this case noted, the Court of Appeals for the Fifth Circuit has confronted similar situations, and its case law contributes significantly to an understanding of the difficulties posed by the situation before us. In *Cain v. Blackwell*, 246 F.3d 758, 759 (5th Cir. 2001), that court affirmed an entry of summary judgment dismissing a hostile work environment claim based on sexual harassment directed at a home caregiver by her Alzheimer's patient. Although the patient repeatedly propositioned his home care nurse for sex and called her disparaging names, the Fifth Circuit determined that the "unique circumstances" of her employment made the "obviously impaired [patient's] commentary insufficient to establish sexual harassment." *Id.* at 760. Because a

home health care nurse's "daily routine included dealing with victims of [diseases like Alzheimer's] and their particular failings," it reasoned that the patient's "unacceptable but pitiable conduct was not so severe or pervasive as to interfere unreasonably with [that nurse's] work performance or, given the circumstances, to create an abusive work environment." *Id.* at 760–61.

Five years later, in *EEOC v. Nexion Health at Broadway, Inc.*, 199 F. App'x 351, 352 (5th Cir. 2006), the Fifth Circuit applied *Cain*'s reasoning to the racially hostile work environment claim of a nursing home employee subjected to frequent racial slurs directed at him by a resident suffering from schizophrenia. Notably, the Fifth Circuit in *Nexion* emphasized that "*Cain* does not establish a bright-line rule that employees who care for disabled, elderly patients can never succeed on a title VII claim." *Id.* at 353. Rather, it calls for an "individualized inquiry into the circumstances of the harassment." *Id.* The objective must be to determine whether, under the circumstances, "a reasonable person would find the work environment hostile or abusive." *Id.* Although the resident's comments "were highly discriminatory" and frequent, "they were not so frequent as to pervade the work experience of a reasonable nursing home employee, especially considering their source." *Id.* The resident's harassment "did not objectively interfere with his work performance or undermine his workplace competence" as the "job required him to deal with the tragic failings of elderly people whose minds have essentially failed." *Id.* at 354. In other words, because the employee "worked in a place where most of the people around him were often unable to control what they said or did[,] [i]t is objectively unreasonable for an employee in such a workplace

to perceive a racially hostile work environment based solely on statements made by those who are mentally impaired." *Id.*

A more recent case from the same circuit emphasizes that *Cain* and *Nexion* are "not a categorical bar on hostile environment claims arising from harassment by patients." *Gardner v. CLC of Pascagoula, LLC*, 915 F.3d 320, 326 (5th Cir. 2019). "The 'specific circumstances' of such claims 'must be judged to determine whether a reasonable person would find the work environment hostile or abusive' taking due account of the 'unique circumstances involved in caring for mentally diseased elderly patients.'" *Id.* (quoting *Nexion*, 199 F. App'x at 353). Severe conduct can still be "enough to allow a jury to decide whether a reasonable caregiver on the receiving end of the harassment would have viewed it as sufficiently severe or pervasive even considering the medical condition of the harasser." *Id.* at 327 (discussing "evidence of persistent and often physical harassment" including an assisted living facility resident's pattern of sexual assaulting female staff).

These Fifth Circuit decisions based their analysis on whether a reasonable health care worker in such an environment would consider the patient's behavior to have made the work environment hostile or abusive, taking into consideration the special circumstances necessarily involved when caring for patients with these afflictions. *See id.* at 326. These cases also acknowledge explicitly that application of a totality of the circumstances test does not always result in exoneration of the employer. There is no general assumption of risk. *See Smith v. Sheahan*, 189 F.3d 529, 535 (7th Cir. 1999). Indeed, the cases specifically point to precedent in other circuits where the conduct of a patient has been considered sufficiently severe or pervasive to constitute harassment. *See Gardner*, 915

F.3d at 326 (citing *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1242–43 (10th Cir. 2001), and *Crist v. Focus Homes Inc.*, 122 F.3d 1107, 1108 (8th Cir. 1997)).

**2.**

With these principles in mind, we now turn to the situations presented by each employee whose claim is now before us from the summary judgment ruling of the district court.

**a. Sonja Fletcher**

Hamilton Pointe hired Sonja Fletcher as a CNA in March 2015. The gravamen of her hostile work environment claim is an assignment sheet posted in the Spring of 2015 which stated, as a special need for resident PT: "No African American Males to Provide Care."

Ms. Fletcher personally cared for PT. In these interactions, PT did not display any racist tendencies. The day before the sheet was posted, a nurse had told Ms. Fletcher and another CNA that PT had made a request for no male caregivers. In this conversation, the nurse did not mention race. That night, black male CNA Roshaun Middleton cared for PT. At that time, Middleton was the only black male CNA assigned to the unit.

When Ms. Fletcher arrived at work the next morning, the assignment sheet stated, for the first time, "No African American Males to Provide Care." Ms. Fletcher was "livid."[9] She spoke with fellow CNA Donna Grissett, Middleton (then at the end of his shift), and other co-workers about the worksheet. Ms. Fletcher then went to the employee charged with

---

[9] R.99-8 at 13.

creating the assignment sheets. She told this scheduler that she had never before seen a racial restriction used on a work-sheet. When the scheduler did not amend the sheet, Ms. Fletcher complained to Director of Nursing Paula Loveall and Administrator Lauren Hayden. After she made these complaints, however, the sheet remained posted. Ms. Fletcher testified that she saw the sheet with the racial restriction up for three days in a row. Ms. Fletcher did not know when or by whom the sheet was taken down. After the assignment sheet was posted, Ms. Fletcher believed that Middleton was banned from caring for PT.

As Director of Nursing, Loveall was responsible for over-seeing CNA work assignments. Loveall testified that Hamilton Pointe never had a policy that allowed assignments based solely on the race of a caregiver. She also testified that, in her position as Director of Nursing, if a resident communicated to her a fear of a particular caregiver because of the caregiver's race and was adamant about not receiving care from that individual, she would reassign the resident's caregiver or move the resident to a different hallway. This particular scenario occurred "[m]aybe twice."[10] The first time, the resident told Loveall that she did not want Middleton as her CNA because he was large and black. Loveall could not recall if this resident was PT. She also could not recall any other specific occasions when a similar request had been made.

Later, Ms. Fletcher called the hotline (operated by TLC as a channel for reporting harassment and other problems at Hamilton Pointe) to report the assignment sheet. She spoke to TLC's hotline operator, who prepared a summary of the call.

---

[10] R.112-17 at 6.

Ms. Fletcher stated that she was concerned about racial prejudice at Hamilton Pointe, described the "No African American Males to Provide Care" statement on the worksheet as an example of that prejudice, reported that Director Loveall and Administrator Hayden were rude to her, and requested an investigation of racial prejudice.

The next day, the hotline operator emailed her summary of the call to Steve Ronillo, TLC's Vice President of Human Resources. Ronillo then spoke to TLC's Regional Director Tamara Bledsoe and TLC's Chief Nursing Officer. Days later, Bledsoe went to Hamilton Pointe. She spoke separately to Ms. Fletcher, Hayden, and Loveall.

After she made her hotline call, Ms. Fletcher never saw another assignment sheet referencing race. She recalled only one other incident in which a caregiver was banned from a room. Grissett, who is black, was banned from caring for a specific resident. Grissett and Ms. Fletcher swapped rooms and the resident did not object to Ms. Fletcher's care.

Ms. Fletcher heard the N-word used many times during her more than thirty-year career as a CNA at multiple facilities. She testified that she heard it more frequently earlier in her career. She did not testify in her deposition that she had heard the slur used at Hamilton Pointe or experienced any incident where she was subjected to racially harassing statements from a resident at the facility.

Ms. Fletcher resigned from Hamilton Pointe in October 2015. She testified that the assignment sheet incident was one of her main reasons for leaving Hamilton Pointe.

The district court decided that Ms. Fletcher was not subjected to a hostile work environment. The court distinguished

Ms. Fletcher's claim from the one in *Chaney* on several grounds. First, the statement on the assignment sheet was not directed at her; it applied to black men, and Ms. Fletcher is a woman. Second, the assignment sheet was taken down three days after Ms. Fletcher complained. Third, Ms. Fletcher never saw another racial restriction on an assignment sheet. Fourth, black employees continued to care for PT after the assignment sheet was posted. Fifth, Ms. Fletcher alleged no co-worker or resident harassment.

We agree with the district court. A reasonable jury could not find that the conduct alleged by Ms. Fletcher constituted sufficiently severe or pervasive racial harassment as to alter the conditions of her employment. Ms. Fletcher's claim, as presented to us by the EEOC on appeal, centers on the assignment sheet. Racially discriminatory assignment sheets were not a pervasive aspect of Ms. Fletcher's experience at Hamilton Pointe. She testified to seeing the "No African American Males to Provide Care" assignment sheet for only three days. After this assignment sheet was removed, Ms. Fletcher did not see another racially discriminatory assignment sheet.

Because discriminatory assignment sheets were not pervasive in her workplace and she alleges no other harassing conduct, Ms. Fletcher must establish that her experiences related to this one assignment sheet were sufficiently severe to alter her working conditions. She cannot do so. The discriminatory assignment did not relate directly to Ms. Fletcher. This does not mean, of course, that the incident had no impact on her. It only means that its impact on her should be assessed as less than its impact on the person and specific category of persons against whom it was directed, Middleton and black men. *See Smith*, 388 F.3d at 567; *see also Yuknis v. First Student, Inc.*, 481

F.3d 552, 554 (7th Cir. 2007) ("[O]ne could be in the target *area* [of harassment] because a group of which one was a member was being vilified, although one was not singled out.").

In arguing against affording lesser impact to the assignment sheet, the EEOC submits that Ms. Fletcher found her work environment subjectively hostile: She testified that the assignment sheet was one of the reasons she left Hamilton Pointe. However, subjective hostility is not enough to establish objective hostility. *See Smith*, 388 F.3d at 566 ("While Weaver did allege that she subjectively experienced her work environment as hostile …, we agree with the district court that she did not sufficiently show her work environment to be objectively hostile within the meaning of Title VII."). Because the assignment sheet did not bar Ms. Fletcher, or any other black woman, from caring for PT, and because she was subjected to no other harassment from staff and residents, Ms. Fletcher's allegations are not, from an objective point of view, sufficiently severe. The district court correctly concluded that the facts of this case are clearly distinguishable from those in *Chaney*. In *Chaney*, the assignment sheet served as a daily reminder that certain residents preferred no black caregivers. 612 F.3d at 912. Here, by contrast, Ms. Fletcher only saw the racially discriminatory assignment sheet for three days. Management was responsive to her complaint. Moreover, Ms. Fletcher was never the subject of discriminatory conduct. By contrast, Chaney's room assignment was restricted by the assignment sheet. Co-workers called Chaney a "black bitch" and the N-word on multiple occasions. *Id.* Ms. Fletcher does not allege any comparable harassment from her co-workers.

### b. Tamara McGuire

Hamilton Pointe hired Tamara McGuire as a CNA in September 2012. She stopped working full-time as a CNA at Hamilton Pointe in 2016 but continued part-time work. Beginning in 2017, she moved into a new role as an Activities Assistant while continuing to pick up CNA shifts.

At a shift change between June and December 2016, a black CNA showed Ms. McGuire an assignment sheet which said "no blacks allowed" with respect to a specific resident in the Skilled Unit. The CNA told Ms. McGuire not to enter the resident's room even if the call light was on. Ms. McGuire did not see this assignment sheet posted, and it was not provided to her by the facility. At the time, there were no printed assignment sheets left in the nurse's station. She only discussed the assignment sheet with the CNA. She did not report it to anyone higher in the management chain.

At her 2018 deposition, Ms. McGuire testified that she had not been told by a CNA to avoid certain residents who requested no black caregivers for "maybe a couple of years."[11] She remembered that in 2014 and 2015, it was common for CNAs to tell their replacement at a shift change which rooms did not want black caregivers. For example, on one occasion, CNAs told her that resident AM did not want black caregivers. Ms. McGuire did not complain about AM's request because it was already known among the CNAs. She never spoke about AM's racial preference with a nurse or supervisor. She never received such a direction from a charge nurse. Such situations were no longer common in 2018.

---

[11] R.99-9 at 24.

During Ms. McGuire's first three or four years at the facility, CN and OJ were residents of the Memory Care Unit. The two black male CNAs who worked in the unit told Ms. McGuire that they could not go into CN's room or OJ's room. Other members of the nursing staff also told Ms. McGuire, in the context of switching assignments, that the black male CNAs could not enter these rooms. Ms. McGuire and other black female CNAs provided care for CN and OJ on a regular basis. Ms. McGuire saw white male CNAs provide them care. Ms. McGuire never reported her concerns regarding CN and OJ to her supervisors or anyone above her in the management chain.

In her time at Hamilton Pointe, Ms. McGuire heard residents use racial slurs, including the N-word. On the Skilled Unit, "certain residents would scream out racial slurs" to Ms. McGuire and other employees.[12] In 2016, resident JS yelled "I don't want you [n-words] in here. Leave me alone" at Ms. McGuire while she was attempting to provide care.[13] Nurse Cindy Rector and a CNA were present when this occurred. After hearing JS use the slur, Rector told Ms. McGuire that Rector would take care of JS for the remainder of the shift. Also in 2016, Ms. McGuire heard a resident call a black CNA a "black bitch" as the CNA was leaving the resident's room.[14] After this incident, Ms. McGuire heard nurses tell black CNAs "Don't go in there" and "We'll have somebody else go in there."[15] Ms. McGuire did not complain about this incident to

---

[12] R.112-12 at 4.

[13] *Id.* at 16.

[14] R.99-9 at 21.

[15] *Id.*

anyone at Hamilton Pointe. Separately, Ms. McGuire heard a resident call another resident a "black bitch."[16] She testified that, in some situations, she believed that reassigning the caregiver was an appropriate response to a resident directing a racial slur at a caregiver.

Later, possibly in February 2018, Ms. McGuire heard a resident call CNA Michelle Johnson, "that black [n-word] bitch."[17] Ms. McGuire heard the slur from the hallway where she was standing with other nurses. Ms. McGuire did not report the incident and did not know if anyone else reported it. This resident did not require CNA care. Ms. McGuire interacted with him only in the context of her duties as Activities Assistant.

Ms. McGuire also alleged that she experienced race-based harassment from two white co-workers, Crystal Brown, a qualified medication aide, and Costelle Beliles, a CNA. Ms. McGuire testified that Brown and Beliles "always made it difficult for every black employee," including Ms. McGuire.[18] They frequently made allegations against black co-workers. This included writing up Ms. McGuire: "[E]very time we had anything, if I would come in five minutes late, they were writing me up. Not to say it wasn't necessary, but just like anything that they could find for me to write me up on."[19] Ms. McGuire reported her difficulties with Brown and Beliles to nurses and her unit managers but could not recall

---

[16] R.112-12 at 18.

[17] *Id.* at 22.

[18] *Id.* at 13.

[19] *Id.* at 14.

specifically what she reported to them. Beliles was terminated by Hamilton Pointe in 2015. Ms. McGuire eventually began scheduling her shifts to avoid Brown.

Ms. McGuire recalled one specific encounter with Brown and Beliles. When Ms. McGuire was working with both co-workers in the Assisted Living Unit, a black man who worked in the Skilled Unit as a dietary aide came to the Assisted Living Unit entrance. Ms. McGuire knew he was an employee and let him in. As Ms. McGuire spoke to the dietary aide, Brown and Beliles called over to the Skilled Unit and to their supervisor to report Ms. McGuire. Nurse Rector and Nurse Jackie Lamp verified that the dietary aide was a Hamilton Pointe employee. Ms. McGuire did not receive any disciplinary action. Ms. McGuire reported this incident to then-Administrator Christina Malvern. In Ms. McGuire's view, the incident was race-related because it was not the standard protocol to make a call when someone came to the door.

During her training to become an Activities Assistant, Ms. McGuire walked past the wife of Administrator Shawn Cates on her way upstairs to the lavatory in the Assisted Living Unit. Cates's wife followed Ms. McGuire, who was not wearing a uniform, up the stairs. From the bathroom, Ms. McGuire heard a conversation between Cates and his wife, in which Cates's wife said, "There was a black girl who just walked up here, and I have no idea where she went."[20] Cates then told his wife that all employees wore uniforms. Ms. McGuire did not complain about this incident to Cates, anyone else at Hamilton Pointe, or the TLC hotline.

---

[20] *Id.* at 11.

The district court determined that, viewing her allegations in their totality, Ms. McGuire could not establish that she suffered severe or pervasive harassment. The court stated that Ms. McGuire alleged only four instances of residents using racially inappropriate language over the course of six years and agreed with the facility's practice of reassigning caregivers in response to resident harassment. The district court characterized her evidence regarding Brown and Beliles as "too vague and speculative to establish severe or pervasive harassment" and determined that there was not enough evidence to show that their conduct was based on race. *EEOC v. Vill. at Hamilton Pointe LLC*, No. 17-cv-00147, 2020 WL 13568924, at *10 (S.D. Ind. Sept. 29, 2020). Regarding the conduct of Cates's wife, the district court concluded that her identification of Ms. McGuire as a "black girl" was not alone sufficient to establish that her conduct was race-based and that since it was never reported, there was no basis for employer liability.

We agree with the district court that the conduct alleged by Ms. McGuire was not sufficiently severe or pervasive to violate Title VII. The incidents she describes occurred across the six-year period between her initial hiring by Hamilton Pointe and her 2018 deposition. Her experiences with abusive residents therefore must be assessed in that temporal context and can be classified fairly as infrequent. *See Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 552 (7th Cir. 2002) (describing six alleged acts of insensitive and offensive conduct including a co-worker's use of the N-word over the course of a year and a half as "infrequent"). Although the frequency of the alleged co-worker harassment is not as well-developed in the record, Ms. McGuire had not worked with Brown and Beliles together since at least Beliles's termination in 2015. And at some point, she ceased working with Brown.

Ms. McGuire heard residents use offensive racial slurs, including the N-word. We have long recognized that "the N-word is an egregious racial epithet." *Scaife*, 49 F.4th at 1116; *see also Paschall v. Tube Processing Corp.*, 28 F.4th 805, 815 (7th Cir. 2022) ("There may well be a situation in which the one-time use of the N-word can be found to be severe enough to warrant liability."). But the context is relevant. "An inquiry into the objective severity of harassment, … 'requires careful consideration of the social context in which particular behavior occurs and is experienced by its target.'" *Cerros*, 288 F.3d at 1046 (quoting *Oncale*, 523 U.S. at 81). For instance, we have drawn a strong distinction between the severity of a supervisor's use of the N-word and that of a co-worker. *Gates*, 916 F.3d at 638. Although certainly still offensive, the use of a racial slur by a resident in the nursing home context would be considered less offensive to a reasonable person than if the same slur were said by a co-worker or supervisor in that same setting. This observation is particularly true when the recipient is a professional trained to give care in a geriatric setting.

Regarding the severity of Brown and Beliles's conduct, Ms. McGuire provides only two specific examples of their harassing behavior. Both occurred before Beliles's termination in 2015. Ms. McGuire describes being written-up for being five minutes late and an incident in which they attempted to get her disciplined for letting a man Brown and Beliles did not recognize into a unit and for speaking with him while on duty. Ms. McGuire does not allege any specific racial comments by either Brown or Beliles. Neither Brown nor Beliles were Ms. McGuire's supervisor and she does not allege that either had supervisory authority over her. Although Ms. McGuire did eventually begin taking shifts to avoid

Brown, there is little other evidence that their behavior impacted her job performance.

The conduct of Cates's wife adds little to the totality of the circumstances analysis. It is not clear that this conduct was race-based. Even if we presume it to be race-based, it can only be classified as mildly offensive.[21]

### c. Vanessa Miles

Hamilton Pointe hired Vanessa Miles in January 2013. Ms. Miles testified that, during her time at Hamilton Pointe, she witnessed discrimination against darker-skinned black employees. Ms. Miles, who does not consider herself darker-skinned, observed that darker-skinned staff members were disproportionately targeted for disciplinary action. On one occasion, Ms. Miles saw a white nurse berate a darker-skinned black nurse for a mistake that the white nurse claimed the black nurse had made. Ms. Miles interceded and assumed the blame for the supposed error. The white nurse then merely indicated "Oh, okay" rather than directing the same treatment towards Ms. Miles.[22] Ms. Miles immediately reported this incident to Director of Nursing Loveall. She explained to Loveall that there was a pattern of discrimination against darker-skinned employees. Loveall told Ms. Miles that she would address the issue. However, Ms. Miles believed this unfair treatment continued.

---

[21] *Cf. Peters*, 307 F.3d at 552 (describing incidents including "a bartender's request to investigate an African American guest who was allegedly stealing coins from a fountain" and "other African–American guests being denied additional ice and cups for a party" as "mildly offensive").

[22] R.99-10 at 14.

Ms. Miles also heard residents make comments that she considered racially derogatory. A resident once told Ms. Miles that she smelled like pork, and Ms. Miles understood this comment to have a racial connotation. On another occasion, Ms. Miles heard a resident say that the darker-skinned nurse, who spoke with a Nigerian accent, could not speak English correctly.

On several occasions, Ms. Miles received warnings from nurses that particular residents were racist. These warnings were common and delivered as "kind of like a joke."[23] A nurse would tell Ms. Miles that a resident "might be a bit racist, so just a heads up" before Ms. Miles cared for the resident and then afterwards ask Ms. Miles how caring for the resident went.[24] The warnings did not affect her job assignments, but they made her feel belittled.

Ms. Miles saw the "No African American Males to Provide Care" assignment sheet on the morning it was posted. This was her first and only time seeing a racial restriction on an assignment sheet. She did not remember how many days she saw the sheet or recall if she complained to anyone about its language. Ms. Miles personally cared for PT. On one occasion, PT had Ms. Miles fluff her pillows for about ten minutes. She stopped when PT's son entered the room and told Ms. Miles she could leave. Ms. Miles did not recall hearing PT make any racist comments. Ms. Miles ended her employment at Hamilton Pointe in June 2015.

---

[23] *Id.* at 9.

[24] *Id.*

The district court determined that Ms. Miles had not been subjected to behavior so severe or pervasive as to alter the conditions of her employment. In the district court's view, the "smell like pork" comment was neither facially racial nor sufficiently offensive to meet the standard. The court characterized Ms. Miles's testimony regarding the incident with the darker-skinned nurse as providing "nothing other than speculation as to why a nurse was frustrated with another African American CNA," but not with Ms. Miles. *Hamilton Pointe*, 2020 WL 13568924, at *11. The court also emphasized that the assignment sheet was not directed at Ms. Miles, did not affect her job assignment, and was the only racially discriminatory assignment sheet that she saw during her employment.

The district court correctly concluded that Ms. Miles was not subjected to severe or pervasive harassment. Ms. Miles's claim turns largely on harassment directed at others and therefore must be distinguished from *Chaney*. Besides the assignment sheet, Ms. Miles principally alleges that harassment was directed against darker-skinned black nurses, a group to which she herself does not belong. In *Walker v. Mueller Industries, Inc.*, 408 F.3d 328, 331 (7th Cir. 2005), we held that a white employee could not succeed on a hostile work environment claim based on racial harassment directed at his black co-workers. Assuming that the alleged conduct was sufficiently severe or pervasive for those black co-workers to meet the standard, we determined that the white employee failed to "establish that the conduct was so offensive to him as a third party as to render the workplace hostile not only for him but for any reasonable employee who likewise was a bystander rather than a target of the harassment." *Id.* Here, Ms. Miles presents a stronger case than that presented in *Walker*; the harassment she observed was directed not against a different

racial group but against other black employees based on their color. Still, Ms. Miles was not within the target area of the harassment. *See Yuknis*, 481 F.3d at 554.

Although the belittling warnings from co-workers and the "smells like pork" comment were directed at her, these comments, even taken together with the secondhand harassment, would not allow a reasonable jury to find that such conduct was sufficiently severe or pervasive to be actionable.

### d. Trent Carter

Hamilton Pointe hired Trent Carter as a dietary aide in April 2013. As a dietary aide, Mr. Carter was tasked with bringing trays of food for residents from the kitchen to the residence halls. Throughout his employment at Hamilton Pointe, he brought the trays on a cart to the residence hall, and the nursing staff then delivered the meals to the resident's rooms. This procedure was the same for all resident rooms regardless of the resident's race. Mr. Carter was never instructed not to enter a specific resident's room. He understood that he was to deliver trays to the residents directly if the nursing staff was unavailable, but he never did so "because the nurse would take it," and he was instructed not to enter rooms by his supervisor Annette Brown.[25]

Around May 2017, on two occasions, Brown instructed Mr. Carter not to enter any resident rooms. Brown told Mr. Carter that white CNAs had told her that black CNAs were not allowed to go into any rooms. Brown also told Mr. Carter that a resident's property had gone missing. Around the same time, Mr. Carter heard rumors from other

---

[25] R.99-11 at 3.

employees that residents' possessions had gone missing. In his four years at the facility before receiving these instructions from Brown, Mr. Carter had never entered a resident's room.

On approximately three occasions, another white supervisor also told Mr. Carter not to enter resident rooms. He told Mr. Carter not to enter the rooms so that residents would not accuse Mr. Carter of stealing from them. This supervisor also said that he had heard that black CNAs were not allowed to enter any resident rooms.

Mr. Carter once overheard the use of the N-word in the facility. As he was standing outside the kitchen, Mr. Carter heard a woman's voice in the kitchen say, "We didn't want that big-ass [n-word] working here no more."[26] Mr. Carter did not know who uttered the slur. He did not report hearing it to anyone. Mr. Carter's employment at Hamilton Pointe was terminated in June 2017.

The district court concluded this evidence was insufficient to establish that Mr. Carter was subjected to a hostile work environment. It characterized the instructions he received to not enter resident rooms as intended to avoid theft allegations and his statements about black CNAs being barred from rooms as inadmissible hearsay. The court emphasized that these instructions did not modify his job duties. The court noted that Mr. Carter only heard the N-word once and that it was not directed at him and stated there was no basis for employer liability.

We agree with the district court's conclusion that Mr. Carter did not experience severe or pervasive

---

[26] *Id.* at 5.

harassment. On one occasion over the span of four years at the facility, Mr. Carter overheard an unknown person use the N-word in an unknown context. He reported this incident to no one at the facility. Despite the inherent offensiveness of the N-word, this single incident adds little to the totality analysis. Mr. Carter testified that the standard procedure for the delivery of food trays throughout his time at the facility was for dietary aides like himself to leave the trays in the halls to be delivered to individual residents by the nursing staff. This procedure was facially race-neutral. The statements made by Mr. Carter's supervisors about other black employees not being permitted to enter the rooms are not inadmissible hearsay if submitted to show only that Mr. Carter understood that the restriction from entering resident rooms was based on race. *See Johnson*, 892 F.3d at 903. However, these statements are not sufficiently offensive in this context to constitute severe or pervasive harassment.

### e. Montoya Smith

Hamilton Pointe hired Montoya Smith as a qualified medication aide in March 2015. Ms. Smith worked for a period of her employment in the Assisted Living and Memory Care Units. While she was employed in these units, Kellie Jean became the assisted living director.

Ms. Smith heard residents use racial slurs on multiple occasions. Several residents used the N-word in her presence. Ms. Smith testified both that residents suffering from Alzheimer's disease or dementia would call her the N-word when they became upset and that she did not know the cognitive state of all the residents who she heard use the N-word. Residents also referred to Ms. Smith as "server" and "the help" on multiple occasions. On one or two occasions, a

resident also referred to her as "boy." Once, a nurse told Ms. Smith to be careful around a resident because the resident had told a CNA that he had probably owned the CNA's grandmother.

Ms. Smith reported resident uses of the N-word and other offensive terms on multiple occasions to those she considered to be her supervisors, including Jean and Administrator Hayden. These supervisors responded to her complaints with comments to the effect of "Oh, it's of their era. You know, they just do that. You know, they have their rights. Well that's— you know, go out and smoke a cigarette."[27] Sometimes, supervisors responded by telling Ms. Smith about how one of their own family members was racist. Ms. Smith felt these responses simply brushed her concerns "under the rug" and that if she reported her concerns to anyone else, they would do the same.[28]

Several co-workers also made statements to and around Ms. Smith that she considered to be racially offensive. A nurse said, in reference to black employees, "I get you girls mixed

---

[27] R.99-18 at 7–8.

[28] *Id.* at 9. These supervisors responded similarly when Ms. Smith reported that residents called her "server" or "the help," they told her, "That's of their era. Don't pay it any attention. Brush it off. You know, that's how they were raised." *Id.* at 9–10. On some occasions, she did not report racially offensive resident conduct because it was witnessed by "the bosses." *Id.* at 9. Ms. Smith also testified that she did not document resident use of the N-word in residents' charts, because she had been instructed by supervisors not to document events which would invite inquiry by state officials. She testified that she probably recorded resident uses of the N-word in paper incident reports but could not specifically recall ever doing so.

up all the time," stated that she had a specific number of black friends and made comments making fun of names she associated with black people.[29] Another co-worker also said that she had a specific number of black friends and stated "I'm not racist. I hang out with black people all the time."[30] Two others told Ms. Smith that they "don't see color."[31] Ms. Smith heard a white qualified medication aide state that she did not understand why "black girls" did not like the aide's relationship with a black man and that it was not "her fault that his black mother had all of those children and didn't do anything for them."[32] Ms. Smith did not report any of these statements by her fellow employees to her supervisors or management because she did not believe they would act upon her complaints. Nor did she tell her co-workers that she found their statements offensive.

Ms. Smith was never prohibited from entering a room because of her race. Nor did she see any written discriminatory assignments. When she reported racial comments made by residents, she did not ask to have her assignments changed. She believed that if a resident used the N-word or refused to have a black caregiver, her supervisors should have assigned that resident a white caregiver. Hamilton Pointe terminated Ms. Smith's employment in May 2016.

The district court determined that the evidence presented was insufficient to support a racially hostile work

---

[29] *Id.* at 10.

[30] *Id.*

[31] *Id.*

[32] *Id.*

environment claim. It concluded that the statements made to and around Ms. Smith by co-workers were "insensitive and show racial stereotypes," but were neither severe nor pervasive. *Hamilton Pointe*, 2020 WL 13568924, at *19. The court found that Ms. Smith heard the N-word from residents suffering from Alzheimer's disease or other memory-impairing conditions and heard other residents using the terms "server" and "the help." Noting that Ms. Smith did not ask to be reassigned and was never threatened physically, it determined, "[g]iven the unique circumstances of her employment," that she was not subjected to a racially hostile work environment. *Id*.

Based on the record before us, we believe that the district court correctly ruled that Ms. Smith was not subjected to a severe or pervasive racial environment that altered the conditions of her employment. The residents' repeated use of the N-word is troubling. But apparently some, and perhaps most, of these aspersions came from patients suffering severe mental impairments. As we have noted, a resident's racist statement, although still very offensive, is not entitled to the same weight as would be warranted if the same statement was made by a co-worker. This conclusion is especially true when the speaker is or could be perceived to be suffering from a medical condition. *See Cain*, 246 F.3d at 760. Patient references to Ms. Smith and other Hamilton Pointe employees as "the help" or "server" are not racist on their face and most certainly do not, standing alone, constitute severe or pervasive racial harassment. Nor do these references when evaluated as

part of the totality of the circumstances meet that standard here.[33]

**f.  Bianca Toliver**

Hamilton Pointe hired Bianca Tolliver as a dietary cook in May 2015. On her first day, a cook, who was white, trained her. While showing Ms. Toliver around the kitchen, the white cook pointed out a mess and told Ms. Toliver that she "was not cleaning up after these [n-words]."[34] Startled, Ms. Toliver told her mentor to repeat herself. The white cook did so, again uttering the slur. Ms. Toliver understood the white cook to be referring to David Ussery, their black co-worker.

Ms. Toliver immediately went to her supervisor, Chef Calvin, and reported the offensive language. Chef Calvin told Ms. Toliver he would address the issue. Chef Calvin then took the white cook aside on that same day. The white cook then apologized to Ms. Toliver but did not receive a suspension. Ms. Toliver considered the apology to be insufficient and told Chef Calvin that she thought the situation had not been handled correctly. Notably, Ms. Toliver believed that Chef Calvin also reported the white cook to Administrator Hayden. However, Administrator Hayden never spoke to Ms. Toliver about the incident. Ms. Toliver did not herself report the incident or her concerns about the laxity of the response to Administrator Hayden.

---

[33] Although some of the residents Ms. Smith heard use the N-word suffered from Alzheimer's disease or other memory issues, Ms. Smith never testified that she exclusively heard the word used by residents suffering from these conditions. She did not know the mental state of all the residents she heard use the N-word.

[34] R.99-19 at 7.

A couple of months later, the same white cook made racial comments to Ms. Toliver and inappropriately touched her hair. She told Ms. Toliver that she came from a town where she rarely saw black people. She then proceeded to run her hands through Ms. Toliver's hair and speak about the difference in texture between Ms. Toliver's black hair and her own hair. Ms. Toliver shoved the white cook's hand away and told her "Get your hands out of my hair."[35] Because the chef position was vacant at the time and because Ms. Toliver did not believe that sufficient action had been taken earlier, Ms. Toliver did not complain about this second incident to anyone at Hamilton Pointe. Afterward, however, she did not feel comfortable working with the white cook. Ms. Toliver tried to schedule shifts to avoid her and began looking for a new job.

Like Mr. Carter, one of Ms. Toliver's job duties was delivering residents' food trays. The standard procedure was for the dietary staff to deliver the trays to the nurse's station and for the nursing staff to then deliver them to the resident rooms. But if the nurses and CNAs were unavailable, dietary staff would sometimes enter resident rooms to deliver trays. Ms. Toliver testified that the dietary employees talked among themselves about limiting the number of employees entering rooms to avoid theft allegations. She believed this goal of avoiding theft allegations did not come from her supervisor or the Administrator and that it was followed by dietary employees regardless of their race.

One day, Yana Shelby, a black CNA, vented to Ms. Toliver about being prohibited from entering certain resident's rooms in the Rehab Unit because of her race. This was the first time

---

[35] *Id.* at 9.

Ms. Toliver had heard another employee complain about racial discrimination at Hamilton Pointe. Ussery also expressed his frustration to Ms. Toliver that black employees were told not to enter certain resident rooms.

A nurse in the Rehab Unit instructed Ms. Toliver not to enter a specific resident's room and to instead leave trays for the resident at the nurse's station. The nurse did not refer to race in providing this instruction, but Ms. Toliver had heard from several CNAs, including Shelby, that this resident refused care from black caregivers. Ms. Toliver followed the instruction for the duration of the resident's stay and never entered the room. She never complained about this incident. She ended her employment at Hamilton Pointe in January 2018.

The district court concluded that, when considered in their totality, Ms. Toliver's experience with the white cook and the tray delivery instructions did not amount to severe or pervasive harassment. The court noted that the instructions not to deliver trays to resident rooms was not a race-based assignment because it was the standard procedure for all dietary cooks. It then concluded that the white cook's conduct was not sufficiently severe or pervasive to establish a hostile work environment and that there was no basis for employer liability. The district court emphasized that although offensive, the white cook's use of the N-word was directed at another employee, not Ms. Toliver, and that the cook apologized and did not use the word again. It also noted that Ms. Toliver did not complain about the hair-touching incident.

The district court correctly concluded that Ms. Toliver's allegations are not sufficiently severe or pervasive to support a hostile work environment claim. The cook's conduct, both in using the N-word in the workplace to refer to a co-worker and

in touching Toliver's hair without permission, was race-based and inappropriate in the workplace. However, these two incidents, the first of which was followed by an apology, are not sufficient to constitute severe harassment. "[O]ne utterance of the N-word has not generally been held to be severe enough to rise to the level of establishing liability." *Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 601 (7th Cir. 2014). In the sexual harassment context, we have held more offensive non-consensual touching than the incident alleged by Ms. Toliver to have not created an actionable hostile work environment.[36]

The statements by co-workers about being banned from rooms, although admissible, must be afforded little weight in these circumstances. In *Johnson*, we "caution[ed] against elevating workplace rumors to evidence of a hostile work environment, although coupled with other evidence this testimony might have relevance in a hostile work environment claim." 892 F.3d at 903. These comments may be admissible to show "that employees understood their environment to be one in which derogatory statements were pervasive," but are the "weakest evidence." *Id.* When faced with such comments, the trial court always must make a prudential judgment as to whether they are more probative than prejudicial. Here, although co-workers' statements to Ms. Toliver that CNAs were banned from certain rooms because of their race is relevant to Ms. Toliver's impression that harassment was pervasive,

---

[36] *See McPherson*, 379 F.3d at 439 (concluding that a supervisor's "inquiries about what color bra McPherson was wearing, his suggestive tone of voice when asking her whether he could 'make a house call' when she called in sick and the one occasion when he pulled back her tank top with his fingers" were not sufficient to establish a sexually hostile work environment).

these utterances must be assessed in light of other evidence to demonstrate, in the totality of the circumstances, where Ms. Toliver was subjected to a hostile work environment. Here, that other evidence is insufficient.

### g. Raven Langley

Hamilton Pointe first hired Raven Langley as a CNA in June 2015. She resigned before completing orientation and without providing independent care to any resident. Hamilton Pointe re-hired Ms. Langley in June 2016. She then trained for two weeks before providing care independently.

After her training period, Ms. Langley experienced racially offensive language from two residents. One resident, who suffered from dementia, called her "the help" between five and twenty times. She did not use any other racially offensive words. Ms. Langley told the resident not to call her "the help," but could not recall how the resident responded. Ms. Langley reported this conduct to her charge nurse and asked if another caregiver could take her place. The charge nurse did not change Ms. Langley's assignment but told her to bring another employee with her when caring for the resident. Ms. Langley was comfortable continuing to care for this resident. She preferred bringing in a second employee.

Another resident used the N-word three to five times in Ms. Langley's presence. The resident said it at least once in the context of telling Ms. Langley that she did not want care from an N-word. Ms. Langley told the resident that the word was offensive but could not recall the resident's response. Ms. Langley reported this resident's use of the N-word to that hall's charge nurse. The charge nurse told her that using the slur was normal behavior for the resident. Ms. Langley was

still comfortable caring for the resident. She did not ask the charge nurse to be re-assigned. On her own initiative, however, she began to take another employee into the room with her when caring for the resident.

About a week before Ms. Langley ended her employment at Hamilton Pointe, the assistant director of nursing came to Ms. Langley and asked how she was doing. Ms. Langley told the assistant director about the language used by the two residents and the assistant director said that she would investigate. Ms. Langley testified that she did not know if the assistant director took any action. In her remaining days at Hamilton Pointe, Ms. Langley did not notice any changes in the two residents' behaviors. She was assigned to their hallways only about twice a week.

Ms. Langley did not believe she was assigned rooms or prevented from caring for any resident because of her race. She saw no assignment sheets that stated no black care. She did see written indications that certain residents had histories of "behavior towards certain races."[37]

Ms. Langley resigned from Hamilton Pointe for a second time in July 2016. She testified that she did not consider the work environment to be offensive "as far as on a day."[38] She suffered emotional harm or distress "[i]n the moment … just from the slurs" but not after.[39]

The district court concluded that no reasonable jury could find that Ms. Langley was subjected to a racially hostile work

---

[37] R.99-13 at 11.

[38] *Id.* at 13.

[39] *Id.*

environment. The court determined that, in the context of caring for a resident with dementia, the repeated use of the phrase "the help" was not so severe as to meet the standard. The court emphasized that Ms. Langley continued to be comfortable providing care for both residents after reporting their behavior. It also noted Ms. Langley's testimony that she did not consider the work environment to be offensive.

The district court did not err in dismissing Ms. Langley's claim on summary judgment. The record will not support the conclusion that she was subjected to severe or pervasive harassment. The two residents' racial abuse, particularly the second resident's use of the N-word, was certainly offensive. But given the nursing home context, Ms. Langley's limited contact with these residents, and her testimony that she was comfortable caring for the residents after she reported their behavior, their comments were neither sufficiently severe nor pervasive to alter the conditions of her employment.

### h. Taki-a Roberts

Hamilton Pointe hired Taki-a Roberts as a dietary aide in November 2015. Early in her employment, a resident, JH, accused Ms. Roberts of abuse. Because of this complaint, Ms. Roberts was suspended. When Hamilton Pointe's investigation later determined that the abuse allegation was unsubstantiated, she returned to work. She was instructed to stay away from JH.

After her return to work, Ms. Roberts, in her view, was harried by Administrator Hayden. Although Hayden never expressly ordered Ms. Roberts not to leave the kitchen, whenever she found her outside the kitchen, she would order her to return. In March 2016, Ms. Roberts's position was changed

to dietary cook. Ms. Roberts testified that Hayden's harassment may have been race-based because Hayden's ire was specifically focused on her. Hayden never expressly referred to Ms. Roberts's race.

In her time at Hamilton Pointe, Ms. Roberts heard several residents use offensive racial language. She heard four or more residents regularly use the N-word. She first heard a resident use the slur during her third or fourth week of employment and from then onward she heard it used two or three times a day in the dining room. Ms. Roberts also heard these residents state outside the dining room that they did not want care from N-words. She did not believe that these residents were referring to her because as a dietary aide she "couldn't really go in their rooms."[40] She knew that black employees cared for these residents. Ms. Roberts also heard JH refer to one of her black coworkers in the kitchen as "boy." Within the kitchen, Ms. Roberts heard black employees use racial language, but she did not consider this language to be discriminatory or harassing.

Ms. Roberts never reported any resident's use of the N-word to management or to the TLC hotline. She had experienced the use of racial slurs by residents while working at other long-term care facilities. Because those institutions "would just sweep it under the rug," she believed Hamilton Pointe would do the same.[41]

Ms. Roberts never heard a supervisor instruct any employee not to enter rooms because of a resident's racial

---

[40] R.99-17 at 10.

[41] *Id.* at 8.

preference, but she believed that black caregivers were told not to care for certain residents. Ms. Roberts herself was never told to stay away from any resident because of her race. Ms. Roberts left Hamilton Pointe in July 2016.

The district court granted Hamilton Pointe's motion to dismiss Ms. Roberts's claim. In discussing the offensive language that Ms. Roberts heard residents use, the district court noted that it was not directed against Ms. Roberts, that she never complained about the comments to management, and that she denied suffering any emotional harm. Finally, it stated that Ms. Roberts's suspension during the elder abuse investigation, as required by federal and state regulations, could not be construed as evidence of a hostile work environment.

The district court properly granted summary judgment. The record will not support a conclusion that Ms. Roberts was subjected to a severe or pervasive racial environment that altered the conditions of her employment. The repeated subjection of an employee to hearing the N-word can be sufficient to constitute an objectively hostile environment. *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004) (holding that the work environment was objectively hostile where co-employees frequently used racial slurs including the N-word and the plaintiff's fellow supervisors used the N-word on more than one occasion). However, here, the speakers were nursing home residents not co-employees. As we discussed above, resident conduct must be given less weight in determining whether a work environment was objectively offensive than the conduct of co-employees. Further, although Ms. Roberts was in the target area of the residents' racist language, the comments were not directed at her. Our precedent

does not require that identical weight be given to an employee's experience of overhearing racial slurs, as would be given if the employee herself was directly called the slur. The objective offensiveness inquiry is driven by context. In the context of employment in a nursing home, Ms. Roberts's experience of overhearing residents using racial slurs does not meet this standard.

Furthermore, there is no basis for employer liability in respect to the resident's racially offensive language. Ms. Roberts never reported the matter. "An employer is not liable for co-employee racial harassment 'when a mechanism to report the harassment exists, but the victim fails to utilize it,'" and the employer was not otherwise "adequately put on notice of the prohibited harassment." *Yancick*, 653 F.3d at 549. The evidence here suggests Hamilton Pointe provided reasonable avenues for employees to report harassment. During the relevant period, Hamilton Pointe's employee handbook included a harassment complaint procedure instructing employees to report any job-related harassment to the administrator, their supervisor, or the hotline operated by TLC. This hotline provided an avenue for reporting outside the management chain. Hotline calls, like the one made by Ms. Fletcher, were received and investigated by TLC staff. The handbook also contained a problem-solving procedure stating that employees were to bring any complaints first to their immediate supervisor and then up the management chain to their department manager, and the administrator. Ms. Roberts did not use these channels to put Hamilton Pointe on notice of the residents' behavior. The EEOC has not presented evidence that management

knew or should have known that residents were frequently using racial slurs in the dining room.[42]

To the extent that Ms. Roberts also alleges a campaign of harassment by Administrator Hayden, a Title VII supervisor, this theory of harassment fails. A reasonable jury could not conclude on this record that Administrator Hayden's conduct toward Ms. Roberts was race-based.

### i. Ruth Washington

Hamilton Pointe hired Ruth Washington as a qualified medication aide in December 2015. Ms. Washington heard three white co-workers make statements that she found racially offensive.

Ms. Washington and white CNA Laura Williams had several conversations about mixed-race children, including Ms. Washington's own nieces and nephews. In one of these conversations, Ms. Washington showed Williams photos of her nieces and nephews. Williams told Ms. Washington that her nephew was "nice looking."[43] When Ms. Washington responded that he was mixed race, Williams asked, "don't they stay with your own kind?"[44] Ms. Washington replied "Yeah, we do."[45] Ms. Washington then asked if Williams would

---

[42] *See Bombaci*, 482 F.3d at 985 (holding that employer did not have constructive notice of frequent sexual harassment that occurred on plant floor and directly next to plant manager's office door over the course of three years since there was no indication that the harassment occurred in front of the plant manager or other supervisors).

[43] R.100-1 at 13.

[44] *Id.*

[45] *Id.*

disown her daughter if she "came home with a black guy?"[46] Williams replied that she would. Ms. Washington told Williams that her answer made her "seem like a bigot."[47] Ms. Washington never reported Williams's comments to anyone else at Hamilton Pointe.

Ms. Washington also heard Nurse Lamp use the phrase "you people" multiple times. On three or more occasions, Lamp made comments about Ms. Washington being difficult to see in the dark. On one of these occasions, Ms. Washington was working on a night shift in a space with "[p]lenty of light" when Lamp told her, "I didn't see you in the dark."[48] Ms. Washington never reported Lamp's comments up the management chain.

Ms. Washington heard Nurse Rector use the phrase "you people" on several occasions when referring to the hair and skin color of black people. In a conversation with Rector about mixed-race children, Ms. Washington told Rector there were mixed-race children in her family, and Rector asked, "what are their skin colors?"[49] Within this same conversation, Rector stated that mixed-race couples should not have children. This conversation upset Ms. Washington, and she expressed this to Rector. Eventually, Ms. Washington began to avoid sitting in the nurse's station where she would have to interact with Rector. Ms. Washington did not complain about these comments to anyone.

---

[46] *Id.*

[47] *Id.*

[48] *Id.* at 11.

[49] *Id.*

According to Ms. Washington, Rector treated her conveyance of resident medication requests with more skepticism than she did for other CNAs. One night, Ms. Washington told Rector that a resident requested Tylenol. Rector asked Ms. Washington, "Really? Did they really ask for it?"[50] After Ms. Washington stated again that the resident had requested the medication, Rector walked down the hall to confirm with the resident before returning to the medical cart to dispense the Tylenol. Since this scenario had occurred before, Ms. Washington predicted to other CNAs that it would happen again.

Two days later, a resident requested a pain pill from Ms. Washington. When Ms. Washington relayed the request to Rector, Rector asked, "Did she really ask, or did you ask her?"[51] Again, although Ms. Washington reaffirmed the resident's request, Rector walked down the hall to confer with the resident before dispensing the pill. In contrast, when Williams relayed a resident's request for medication, Rector expressed no skepticism and delivered the pill without first confirming with the resident. However, Rector did trust Ms. Washington with delivering medication. Sometimes, Rector would ask Ms. Washington to deliver pills to residents at the end of the hall, even though the task was within Rector's job duties.

Ms. Washington complained to Lamp about Rector's treatment of her with respect to the distribution of medication. She knew Rector and Lamp were friends. She did not report her

---

[50] *Id.* at 16.

[51] *Id.*

concerns to Administrator Cates, because Cates made her un-comfortable.

Although Ms. Washington never saw an assignment sheet stating no black care, she was instructed not to enter a resident's room because of her race. Nurse Lamp told Ms. Washington that she was not permitted to enter resident LE's room because LE did not want black people in her room. Ms. Washington testified that she and Amber Cottrell, the other black CNA assigned to the hall, did not provide care for LE. Hamilton Pointe's records indicate that Ms. Washington was assigned to care for LE on two dates and that after these dates, Cottrell was assigned to care for LE. Ms. Washington testified that on one occasion, she did enter LE's room and LE told her, "You're not supposed to be in here."[52] When presented at her deposition with documentation of a complaint filed against her by LE, Ms. Washington testified that she could not recall if LE ever filed a complaint against her. Ms. Washington did not report being barred from LE's room to management. She testified that she could not recall making a call to the TLC hotline. Hamilton Pointe terminated Ms. Washington's employment in May 2017.

The district court dismissed Ms. Washington's claim. It determined that no reasonable jury could find that Ms. Washington's re-assignment away from caring for LE was race-based because Hamilton Pointe's records indicated that this reassignment occurred after LE filed a grievance against her and, after that, LE continued to receive care from other black CNAs. It further stated that Rector's references to "you

---

[52] *Id.* at 12.

people" did not rise to the level of severe or pervasive harassment.

This record will not support a conclusion that Ms. Washington was subjected to severe or pervasive harassment. The harassing conduct alleged by Ms. Washington consists primarily of unreported co-worker comments. The comments made by Ms. Washington's co-employees during conversations about mixed-race children did not alter the conditions of her employment. Assuming, for the sake of argument, that these statements reasonably could be characterized as harassment, they are certainly neither severe nor pervasive. In regard to LE, Ms. Washington's testimony about Lamp's explanation for her prohibition from the room is insufficient to show that her prohibition from the room was race-based. Hamilton Pointe has produced evidence that LE was assigned black caregivers including Ms. Washington, and that LE continued to be assigned black caregivers after Ms. Washington was banned from her room.

**j. Lashawn Johnson**

Hamilton Pointe hired LaShawn Johnson as a CNA in February 2016. While working in the Skilled Unit, Mr. Johnson saw a worksheet stating in some abbreviated form "no African American care" with respect to particular residents. It also said "No Male Care" for certain residents. This worksheet was up for a two-week period in the hall to which he was assigned. This was the only assignment sheet Mr. Johnson saw indicating a racial prohibition on caring for a resident.

Mr. Johnson testified that, on the halls where he worked, three or four residents, including LK, asked for "No Male Care" but accepted care from white male employees.

Mr. Johnson specifically saw a white male wound-care nurse provide care to at least one of these residents. Because LK requested no male care, Mr. Johnson had to switch out with a CNA assigned to another hall to accommodate her request. He still took LK treats and responded to her call lights. Although LK did not want Mr. Johnson to provide personal care like changing her, she accepted this care from both black female and white male employees.

While working at the facility, Mr. Johnson was in a relationship with a fellow Hamilton Pointe employee, who is white. Mr. Johnson sometimes went to that employee's unit to assist her. A nurse in that unit told Mr. Johnson to stay in his own unit. Mr. Johnson also heard this nurse ask the other employee, "Why are you with him? Why are you with a black man? Why don't you have a white man?"[53]

On his visits to the other employee's unit, Mr. Johnson would socialize with a particular male resident. This situation changed after the resident's wife discovered that Mr. Johnson was dating a white woman. A nurse told Mr. Johnson, "You're not allowed in that room because she don't want her husband getting took care of from a black man, from blacks."[54] He did not complain to anyone about the nurse's comment. Mr. Johnson's employment ended in spring 2016.

The district court determined that Mr. Johnson was not subjected to an objectively hostile work environment. In doing so, it emphasized that Mr. Johnson encountered only one discriminatory assignment sheet, provided non-personal care

---

[53] R.99-12 at 13.

[54] R.113-11 at 10.

to LK and was not assigned to the male resident's room from which he was banned.

We agree with the district court's analysis. The district court correctly decided that the record will not support a conclusion that the events of which Mr. Johnson complains constituted severe or pervasive harassment. He encountered a racially discriminatory assignment sheet, but such sheets were not a pervasive aspect of his employment like they were in *Chaney*. Given Mr. Johnson's testimony that the assignment sheet he saw was directed against all black employees, its impact must be considered as more severe in respect to him than the "No African American Males to Provide Care" sheet was in respect to Ms. Fletcher. However, when evaluated with his other experiences it is not sufficiently severe as to alter the conditions of his employment. His observation that a few residents accepted care from white male employees despite requesting no male care adds little to assessing the objective offensiveness of the work environment. Although a race-based motivation for the instruction to remain in his own unit can be inferred from the nurse's other statements, it is significant in weighing the offensiveness of this prohibition that Mr. Johnson was not assigned to that unit. Similarly, his prohibition from entering the male resident's room must be construed as less offensive because he was never assigned to care for that resident. Neither of these prohibitions altered his job duties or interfered with his work performance.

Moreover, there is no basis for employer liability. No testimony has been presented indicating that Mr. Johnson raised his concerns about the assignment sheet he encountered or the other alleged harassing conduct to anyone at Hamilton Pointe. Even if Hamilton Pointe were on notice of the race-

based assignment sheet given Ms. Fletcher's 2015 complaint, the EEOC has not explained why Hamilton Pointe should have known about Mr. Johnson's experiences in the unit he was not assigned.

### k. L'Sheila Lewis

Hamilton Pointe hired L'Sheila Lewis as a CNA in April 2016. During her employment, Ms. Lewis was told on two occasions by a white co-worker not to enter a particular resident's room in the Rehab Unit because the resident did not want any black people in her room. A white nurse, without expressly referring to race, told her that CNAs needed to respect this resident's "right to refuse care from a person."[55] Ms. Lewis did not report the resident's request to anyone. She did not see any racial preference documented in writing for the resident.

Ms. Lewis experienced an incident of racially harassing language at Hamilton Pointe. A white female resident berated Ms. Lewis when she entered the resident's room to assist her. She called Ms. Lewis several names including "black B" and the N-word.[56] Ms. Lewis had previously cared for the resident without encountering racial abuse. She only reported the incident to Ms. Washington. Ms. Washington told Ms. Lewis she would document what happened and report it to the charge nurse. Ms. Lewis recorded in the resident's chart that she "used some very colorful language."[57]

---

[55] R.113-9 at 7.

[56] *Id.* at 4.

[57] *Id.* at 5.

Later that night, Ms. Lewis had a heated confrontation with Ms. Washington, Nurse Lamp, Cottrell, and Williams that began after Ms. Lewis rejected Ms. Washington's request for Ms. Lewis to deliver a snack to a resident. After her shift ended, Ms. Lewis was suspended because of this confrontation. She was subsequently terminated less than two months after she was hired. Because of this suspension and termination, Ms. Lewis never received any more information about the incident with the resident.

The district court determined that no reasonable jury could find that Ms. Lewis was subjected to a racially hostile work environment. In doing so, the district court also noted that Ms. Lewis testified that she did not raise any concerns about what the CNAs told her. In discussing the incident of resident harassment, the court emphasized that Ms. Lewis complained only to Ms. Washington, did so on her last day, and never saw the resident again.

We agree with the district court's analysis. Ms. Lewis's claim consists of co-employee statements made about a resident refusing black caregivers and a single incident of verbal racial abuse committed against Ms. Lewis by another resident. Interpreting the nurse's "a person" statement, as the EEOC asks us to, as endorsing the resident's request to not receive care from black caregivers, these events, in their totality, constitute neither severe nor pervasive harassment.

There is no basis for employer liability. Ms. Lewis did not report to anyone that the CNAs told her about the resident's request for no black caregivers and that a nurse had instructed her to follow the request. Ms. Lewis told only Ms. Washington, a qualified medication aide, about being harassed by the resident. Even if there was a reasonable basis for Ms. Lewis to

believe that Ms. Washington "had the responsibility to, and would, refer [her] complaints to someone who could address the problem," *Lambert*, 723 F.3d at 867, Ms. Lewis never again dealt with the resident who harassed her. Hamilton Pointe could not have been negligent in failing to remedy this harassment.

### l. Naim Muhammad

Hamilton Pointe hired Naim Muhammad as a CNA in August 2016. One day, as several employees including Mr. Muhammad were gathered at a nurse's desk in the Skilled Unit, Nurse Lamp told the charge nurse, "That boy can't work down that hall there."[58] Mr. Muhammad knew Lamp to be referring to him and a particular service hall.

On a separate occasion, Mr. Muhammad heard a nurse tell a black female CNA that she was prohibited from working in the same service hall because the residents in that hall did not want black caregivers. This was the only time he heard a statement that black caregivers were forbidden in a particular hall. Mr. Muhammad believed that all men and black women were not permitted to work in the hall. He discussed these racial prohibitions with co-workers but did not complain about the issue to management or call the hotline.

Around the same time as the comment was made to the CNA, Mr. Muhammad was assigned to some rooms in this service hall as part of a split assignment with another hall. He was not prohibited from entering his assigned rooms. But on several occasions, Lamp, Ms. Washington, and other co-workers instructed Mr. Muhammad not to enter specific other

---

[58] R.100-4 at 4.

rooms in the hallway. More than a couple times, these oral instructions referenced his race as the reason for this prohibition. Although not rooms to which Mr. Muhammad was assigned, these were rooms for which he would have been expected to answer a call light.

Mr. Muhammad never saw any written assignment sheet stating a resident's racial preference for caregivers. He heard co-workers mention "different notes about black people," but he did not see them himself.[59] Mr. Muhammad's employment at Hamilton Pointe ended in July 2017.

In granting Hamilton Pointe's motion for summary judgment, the district court characterized Lamp's "[t]hat boy can't work down that hall" comment as "at most, an isolated offensive utterance." *Hamilton Pointe*, 2020 WL 13568924, at *25. It determined that neither Lamp nor Ms. Washington's comments affected his job assignments.

The district court correctly concluded that Mr. Muhammad was not subjected to severe or pervasive harassment. Lamp's statement that he could not work down a hall—though offensive to Mr. Muhammad in its use of "boy"—is not sufficient to establish that Hamilton Pointe had a policy of prohibiting black CNAs or black male CNAs from that hall.[60] Mr. Muhammad himself was assigned to the same hall.

---

[59] R.112-20 at 13.

[60] Because no evidence has been presented that nurses could take tangible employment actions against CNAs, Lamp was not Mr. Muhammad's Title VII supervisor. *See Vance*, 570 U.S. at 424; *Montgomery v. Am. Airlines*, 626 F.3d 382, 391 (7th Cir. 2010) (holding that a crew chief's "occasional authority to oversee some aspects" of Montgomery's work as a mechanic did not render him a Title VII supervisor).

Furthermore, there is no basis for employer liability. Mr. Muhammad did not report the statements banning him or other black CNAs from the hall and the specific rooms to anyone above him in the management chain.

**m.  Sara Johnson**

Hamilton Pointe first employed Sara Johnson in 2014. In November 2016, it re-hired her as a CNA. During either her first or second period of employment, Ms. Johnson heard two female residents say they did not want black caregivers. One of them used the N-word in doing so. These requests were then reflected on at least one assignment sheet that indicated "no black caregivers." After these requests, she no longer cared for these two residents and found her own replacements. She could not recall if she reported the discriminatory assignment sheet to management.

On "maybe two" occasions during her second stint of employment, Hamilton Pointe residents called Ms. Johnson the N-word.[61] When she reported resident use of the N-word to nurses, they would reply, "That's the era that they came from."[62] After a resident called her the N-word, she had to find co-workers to replace her. Ms. Johnson then did not care for that resident on later shifts. She resigned from Hamilton Pointe in April 2017.

The district court concluded that Ms. Johnson was not subjected to a racially hostile work environment. In the district court's view, her claim relied upon the discriminatory assignment sheet but she could not remember any details regarding

---

[61] R.100-3 at 6.

[62] *Id.* at 7.

that assignment sheet including when it was posted. It distinguished Ms. Johnson's claim from *Chaney* on the grounds that Ms. Johnson did not allege that she saw race-based assignment sheets for several months in a row, was banned from resident rooms, or experienced co-worker harassment.

Ms. Johnson was not subjected to severe or pervasive harassment. The district court incorrectly stated that Ms. Johnson did not allege to have been banned from rooms, but that complaint is implicit in her statement that she was required to find a replacement when the two residents requested no black caregivers. The other factors upon which the court distinguished her claim from *Chaney* are sound. Ms. Johnson did not allege co-worker racial hostility. She alleged seeing written race-based assignments for two residents, not that racially discriminatory assignment sheets were prevalent in her time at Hamilton Pointe. Ms. Johnson was subjected to resident use of the N-word, but she testified that this happened "maybe" twice in her second stint of employment. As we have discussed, in the nursing home context, two resident uses of the N-word are not sufficiently severe to establish a hostile work environment claim. Taken together, the assignment sheet and two resident uses of the N-word constitute neither severe nor pervasive harassment.

### n. Amber Johnson

Hamilton Pointe hired Amber Johnson as a CNA in April 2017. Ms. Johnson alleged hostile treatment from several residents. She also alleged that her repeated assignments to the more difficult Rehab Unit were race-based.

When resident RG requested snacks and Ms. Johnson could not fulfill his requests because the kitchen was locked,

RG became angry with her. He called her "stupid" and "lazy."[63] Though RG did not expressly reference race, Ms. Johnson perceived his belittling language to be racially motivated.

The next day, a CNA asked Ms. Johnson what happened between her and RG. After Ms. Johnson explained what occurred, the CNA, without mentioning race, told her that she was not allowed to go back into RG's room. Ms. Johnson reported the incident to Nurse Deb Butturi. Since the incident occurred on the night shift, there was no management in the building at the time.

About a month later, Ms. Johnson responded to RG's call light. When she entered the room, he told her "Get. You know you are not supposed to be in here. Get." and repeated the word "Get" while pointing at the door until Ms. Johnson left.[64] She reported this incident to Butturi. Ms. Johnson did not provide care again to RG. She does not believe that anyone spoke to RG after either incident.

Resident JL was known among facility staff for his inappropriate behavior. Ms. Johnson testified that his inappropriate conduct was more sexually oriented than racially oriented, but described two incidents in which he made racial comments. During one shift, JL suggested that Ms. Johnson and another employee "get naked and rub Mazola oil on [their] bodies and see what happens because he would love to see [their] brown bodies oiled up."[65] On another shift, JL

---

[63] R.100-7 at 8.

[64] *Id.* at 6.

[65] *Id.* at 7.

told Ms. Johnson that he was not a racist because he had grown up with black people and proceeded to discuss black people he had employed.

Either Ms. Johnson or the other employee reported this first incident, but Ms. Johnson did not believe any action was taken in response. She testified that she probably documented the behavior in JL's chart and that his inappropriate behavior was reported to nurses on other occasions.

Another resident, JT, did not make any racial or offensive statements to Ms. Johnson but was reluctant to receive care from her. Ms. Johnson told Nurse Sylvia Wolf about JT's reluctance to receive care. Wolf told Ms. Johnson "Don't go back in that room."[66] Ms. Johnson asked, "What's going on?"[67] Wolf replied, "Oh, she's a bigot."[68] Wolf also told her that JT had dementia and was "from that generation where that was normal, and that generation—it's still fortunate that that generation is dying off."[69] Ms. Johnson only dealt with JT for one part of one shift; she never cared for her again. She could not recall if she documented the incident in JT's chart.

Ms. Johnson wanted to report this incident regarding JT to management. She placed a note under the door of then-Director of Nursing Lynn Jones. This note stated "I'm having some issues. I really need to talk to you."[70] She also wrote that she needed a break from the Rehab Unit. Ms. Johnson had

---

[66] *Id.* at 6.

[67] *Id.*

[68] *Id.* at 7.

[69] *Id.* at 12.

[70] *Id.* at 11.

intended to discuss the specifics, including the incident with JT, when she had an opportunity to speak with Jones. This was one of many notes Ms. Johnson left under Jones's door before she had the opportunity to speak with her. Jones was seldom available to Ms. Johnson. Ms. Johnson worked the night shift, and Jones worked during the day. Ms. Johnson did eventually speak with Jones on multiple occasions, including at least once after she left the note. Ms. Johnson does not recall the substance of their conversations.

Nurse Lamp told Ms. Johnson that when she saw black CNA Jo Murray in a dark room, Lamp said: "Oh, my God, I didn't even see you. You're so black. It's dark in here."[71] In telling the story, Lamp cast the event as funny. Ms. Johnson did not tell Lamp that she was offended but conveyed her offense through her facial expression. Ms. Johnson told Murray what Lamp had told her but did not report Lamp's story to anyone higher in the chain of command.

Ms. Johnson initially worked mostly in the Skilled Unit but was later assigned primarily to the Rehab Unit. She believed the Rehab Unit to be "substantially harder, more demanding."[72] She continued to be assigned almost exclusively to the Rehab Unit, even as she requested to work in other units. She was told that the reason for her assignment to the Rehab Unit was because she worked twelve-hour shifts, but she knew of four non-black employees who also worked twelve-hour shifts and did not work exclusively in the Rehab Unit. Only she and another person, who she identified as also

---

[71] *Id.* at 14.

[72] *Id.* at 15.

"brown," "worked Rehab, never had opportunities to work anywhere else."[73]

When she was assigned to the Rehab Unit, it was short-staffed. Ms. Johnson and another black CNA would have responsibility for all of the unit's eighty patients. They repeatedly asked for more CNAs to be assigned to help, but their requests were denied. When white employees working in the Skilled Unit asked for help, their shift was expanded from two to four CNAs.

Ms. Johnson repeatedly complained to Director Jones and the assistant director of nursing about her assignment to the Rehab Unit. In one note to Jones, Ms. Johnson wrote that the people who worked twelve-hour shifts, without having to work exclusively in the Rehab Unit were not "brown" but she and the "brown" employee had to work all their shifts in the Rehab Unit: "I think you guys know why."[74]

During this same period, Ms. Johnson had an ongoing dispute with Williams, who worked in the Skilled Unit. Ms. Johnson frequently reported Williams's conduct to Director Jones and another supervisor over a six-month period, but no action was taken. She told them that Wiliams had been threatening to fight her. Ms. Johnson asked for a meeting with Administrator Cates. This meeting was scheduled, but Cates did not appear.

Near the end of her employment at Hamilton Pointe, Ms. Johnson was asked to work an unscheduled shift on a Saturday. She conditioned her acceptance on her not being

---

[73] *Id.*

[74] R.113-21 at 17.

assigned to the Rehab Unit. When she arrived at the facility, she nevertheless discovered that she was assigned to the Rehab Unit. She refused to work the shift and called Administrator Cates. Cates told her that he was at a wedding and asked why she called him on a Saturday. Cates ended the call by telling Ms. Johnson "We have been on the phone for nine minutes, Amber. I can't get these minutes back," and that other facilities were hiring.[75] Ms. Johnson worked the shift and soon after found another job. Ms. Johnson's employment ended in July 2018.

The district court determined that the EEOC failed to establish that Ms. Johnson was subjected to a racially hostile work environment. In the district court's view, much of the harassing conduct alleged by Ms. Johnson was not based on race. It placed JL's "brown bodies" comment and JG's conduct into this category because JL made sexually inappropriate comments to caregivers of different races and the insults used by JG were not facially racial. The court determined that Ms. Johnson's subjective belief that her Rehab Unit assignment and lack of support were race-based was insufficient to support her race-based assignment claim.[76] The district court concluded that the incidents it classified as race-related (Lamp's story, the instruction not to enter JT's room, and JL's proclamations that he was not racist) when taken together did

---

[75] *Id.* at 5.

[76] Citing seven Hamilton Pointe staffing sheets from 2015 and 2016, the district court stated that "[b]oth African American and Caucasian employees were assigned to all halls at Hamilton Pointe." *Hamilton Pointe*, 2020 WL 13568924, at *28.

not support a finding that she was subjected to severe or pervasive harassment.

The district court did not err in finding that Ms. Johnson was not subjected to severe or pervasive harassment. We cannot accept, however, the court's characterization of JL's "Mazola oil" comment. A reasonable factfinder could find this comment to be race-based. Even when this comment is taken into consideration, Ms. Johnson's experiences of resident and co-worker racial harassment are, in their totality, insufficient to constitute severe and pervasive harassment. She was not exposed to residents' use of the N-word. The only race-based comment she heard from a co-employee was Lamp's offensive joke about not seeing Murray in the dark.

An undesirable and stigmatizing job assignment can contribute to a hostile work environment. In *Hall v. City of Chi.*, 713 F.3d 325, 330 (7th Cir. 2013), we recognized that, viewed in its totality, a supervisor's conduct in assigning an employee to unnecessary menial work, forbidding her from speaking to her co-workers, banning her from meetings, and subjecting her to occasional verbal outbursts constituted severe or pervasive harassment. However, unlike in *Hall*, there is no suggestion that Ms. Johnson was assigned to "useless" and "menial" tasks to ostracize or humiliate her. *See id.* Nor is there any evidence that she was assigned more difficult tasks in order to compel her to resign. Her subjective assessment that her assignments to the more difficult Rehab Unit were race-based stemmed only from her own conclusions that the assignments must have been race-based. She was not subjected to race-based comments from the supervisors charged with making the assignments. Her exclusive assignments and lack

of support in the Rehab Unit hardly support a harassment claim.

**o. Charah Milan**

Hamilton Pointe hired Charah Milan as a CNA in May 2017. Ms. Milan was subjected to racially offensive language in the course of her employment. On one occasion, Ms. Milan heard a resident tell another resident: "That [n-word] you know was in here."[77] When Ms. Milan heard this, she shook her head and walked on.

Ms. Milan heard residents frequently used the phrase "that colored girl," often in the context of identifying black employees. She heard co-workers use the phrase about ten times, mainly when quoting residents; one co-worker would tell another co-worker that a resident "said she was looking for that colored girl."[78] Residents would also sometimes refer to white employees as "the white girl," but employees did not repeat these identifications. Ms. Milan did not report her concerns about the phrase to anyone.

Ms. Milan never saw any racial preference expressed in writing and was never told not to go into a room because of her race. A black CNA told Ms. Milan that she saw a document which stated that black caregivers should not enter the rooms of particular residents. Ms. Milan did not raise any concerns to management about the CNA's story. Hamilton Pointe terminated Ms. Milan's employment in August 2017.

The district court concluded that Ms. Milan could not establish a hostile work environment claim. It found that

---

[77] R.100-8 at 3.

[78] *Id.*

residents' use of racial descriptors like "colored girl" did not rise to the level of severe or pervasive harassment. The court stated that Ms. Milan's testimony about the other CNA's statements was inadmissible hearsay and emphasized that Ms. Milan never experienced a race-based assignment herself.

The district court correctly concluded that Ms. Milan was not subjected to severe or pervasive harassment. She heard the N-word used by a resident on one occasion, heard residents frequently use the term "colored" to describe employees, and heard co-employees use the term "colored" principally in the context of quoting the residents. In the context of a nursing home, these comments, taken in their totality, are not so severe or pervasive as to alter the conditions of Ms. Milan's employment. Further, there is no basis for employer liability. According to the record, Ms. Milan never raised concerns about any of the harassing behavior she alleges to anyone above her in the management chain at Hamilton Pointe.

**3.**

In sum, the evidence of record does not support, under established principles of law, a case for racial harassment that was so severe or pervasive as to alter the conditions of employment for any of these claimants. Moreover, in many of the instances, the record will not support an inference that the matter at issue was reported to a level of management capable of effecting the needed change to abate the claimed injurious practice. Nor, in many cases, is it sufficiently clear that the employee reported the condition to a supervisor who could be reasonably expected to report the condition to such a management level. A more detailed description of the responsibilities of the various employees involved in the management of the institution is generally necessary in institutions such as

the one involved here. We cannot assume that those who have supervisory responsibility for the level of professional health care over those of lesser rank in the healthcare setting necessarily have management or disciplinary authority and responsibility over those same individuals. The record in this case cannot be characterized as adequate in this regard. *See Young v. Bayer Corp.*, 123 F.3d 672, 674–75 (7th Cir. 1997); *see also Huston v. Proctor & Gamble Paper Prod. Corp.*, 568 F.3d 100, 107–08 (3d Cir. 2009); *Torres v. Pisana*, 116 F.3d 625, 634–38 (2d Cir. 1997).

**B**

The EEOC also asks that we consider matters with respect to the claimants whose cases went to trial. In order to give meaningful context to the matters that we now will discuss, we point out that the EEOC raises no objection on appeal to the instructions given to the jury by the trial judge.

What the EEOC does suggest, however, is that the verdict forms submitted to the jury deflected the jury's attention from considering, with respect to each claimant, its obligation to consider all the circumstances as known by the defendant at the time of the alleged incidents.[79] The final verdict forms

---

[79] Hamilton Pointe submits that this contention has been waived because the EEOC did not object to the district court's final verdict forms at trial. When a party fails to raise an objection to verdict forms at trial, it either forfeits or waives that objection on appeal. *See Robinson v. Perales*, 894 F.3d 818, 827 (7th Cir. 2018).

After an informal and unrecorded conference on the final day of trial, the district court provided the EEOC an opportunity to object on the record to the final jury instructions and final verdict forms. The EEOC used

(continued … )

required jurors to indicate separately whether the EEOC had proven that a claimant was subjected to a hostile work environment by supervisor harassment and whether the EEOC had proven a claimant was subjected to a hostile work environment by co-worker/resident harassment.

We review the district court's verdict forms for abuse of discretion. *Malone v. Reliastar Life Ins. Co.*, 558 F.3d 683, 692 (7th Cir. 2009). "In evaluating whether a verdict form is confusing or misleading, we consider the verdict form in light of the instructions given to determine 'whether [the jury] had [an] understanding of the issues and its duty to determine those issues.'" *EEOC v. Mgmt. Hosp. of Racine, Inc.*, 666 F.3d 422, 439 (7th Cir. 2012) (quoting *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 827 (7th Cir. 2010)). The court "will not set aside a verdict unless a party suffered prejudice from the assigned error." *Happel*, 602 F.3d at 826.

In the EEOC's view, the verdict forms precluded the jury from considering, with respect to each claimant, the totality of the circumstances. The gravamen of its complaint is that, by asking jurors to evaluate supervisor harassment separately from coworker/resident harassment, the jury's attention was necessarily deflected from considering all the circumstances in determining if the claimants experienced severe or pervasive harassment. This argument has no merit. Following the

this opportunity to object to several of the district court's final jury instructions but raised no objection to the verdict forms.

The EEOC explains its failure to object by asserting that it believed its objection would have been futile because of its prior objection to Hamilton Pointe's proposed verdict forms. After careful examination of the trial record, we conclude that there is sufficient ambiguity in that record to make it inadvisable to rest our decision on waiver.

Seventh Circuit's pattern jury instructions, the district court carefully and methodically first set forth the separate requirements for harassment by co-employee or third party and for harassment by supervisor.[80] The verdict forms mirror those instructions. The district court acted well within its discretion in determining that to separate the elements of supervisor harassment and co-worker/resident harassment in the jury instructions while asking the jury to evaluate them together as a single item in the verdict form would have invited juror confusion.

Further, the district court did not fail to communicate to the jury that a hostile work environment should be considered based on the totality of the circumstances. Indeed, the court's jury instructions clearly told the jurors to consider "all the circumstances known to the Claimant at the time of employment" when evaluating whether a reasonable person would find the work environment to be hostile.[81]

The district court's final verdict forms did not constitute an abuse of its discretion.

## C

Finally, because the jury determined that Hamilton Pointe was liable in damages to one of the claimants whose case went

---

[80] The court followed Pattern Civil Jury Instructions of the Seventh Circuit, 3.04, 3.05A, 3.05B (rev. 2017). The district court's jury instructions number 19 and 20 adhere to pattern instructions 3.04 and 3.05.

[81] R.290 at 24 (Instruction #21).

to trial, we must assess the EEOC's contention that TLC also might be liable for this judgment.

TLC is an Indiana corporation with its principal office in Marion, Indiana. At the relevant time, TLC was owned and operated by Gary Ott, Ryan Ott, Dwight Ott, and Cullen Gibson. These four individuals were also managing members of Hamilton Pointe. Hamilton Pointe had at least one additional managing member, Administrator Shawn Cates. Although the two entities shared common owners, TLC did not own a membership interest in Hamilton Pointe.

TLC provides management consulting and a variety of other services to multiple health care facilities including Hamilton Pointe. A management agreement signed in 2012 governs the relationship between Hamilton Pointe and TLC. Under its terms, TLC provides management support, computer support, accounting support, and other services to Hamilton Pointe. More specifically, Hamilton Pointe relies on TLC's services in several areas. Hamilton Pointe uses TLC's payroll processing to pay its employees and provides benefits to its employees through a TLC-offered group benefits plan while paying the costs of those benefits. TLC also temporarily fills vacancies at Hamilton Pointe with its own employees and operates the hotline to receive, process, and investigate complaints made by Hamilton Pointe employees. In exchange for these services, Hamilton Pointe pays TLC 6.5% of its monthly net revenue.

Cates, the administrator of Hamilton Pointe at the time this suit was filed, testified that, as administrator, he is responsible for management decisions at Hamilton Pointe and supervision of the department heads who manage the day-to-day operations of the facility's staff. The Hamilton Pointe

administrator is hired, supervised by, and subject to termination by TLC. The administrator must consult with TLC regional and departmental directors on a range of matters. Cates stated that, as administrator, he retains, despite his obligation to consult with TLC, ultimate authority over these decisions. For example, although TLC sets Hamilton Pointe's pay scale, Cates testified that he went outside the scale when hiring a director of sales and had the autonomy to do so.

Cates stated that as Hamilton Pointe's administrator he has hiring and firing authority over the department managers who in turn have hiring and firing authority over the employees in their departments. Hamilton Pointe's disciplinary forms require that both the written warnings prior to an employee termination and the termination itself "must be reviewed" by TLC's regional director of operations and Human Resources department head.[82] Hamilton Pointe and TLC maintain that TLC did not have the authority to hire or fire non-management staff at Hamilton Pointe, including the individual class members in this case.

Christina Malvern, the administrator of Hamilton Pointe from May 2013 to August 2014, stated that TLC approval was required for several tasks including employment decisions: "I could not terminate any employee without approval from TLC's Human Resources department."[83] Gary Ott, President of TLC, testified that although TLC HR staff advise the administrator on following the correct termination procedures and whether Hamilton Pointe has sufficient cause for termination, "it's still the administrator's decision because the

---

[82] R.110-5 at 14.

[83] R.110-14 ¶11.

administrator is the one that's finally responsible and runs the show."[84] Ott conceded that the administrator is beholden to the TLC regional director, but maintained that TLC does not dictate facility policy:

> I would say that the regional director has more authority, probably, than anybody, because the administrator works for them. So the administrator is going to listen to them. But as far as – we have not set it up in that sense that the management company is dictating what's going on back and forth. We don't do that because we're out of the loop. When we are up in the ivory tower over here in Marion, Indiana, we don't understand what's going on down here. So we should not be making those decisions, but we can advise people right and wrong, you know, type thing like that.[85]

In TLC's motion for partial summary judgment, it contended that it did not have an employer-employee relationship with the class members and therefore could not be found liable to them under Title VII. The EEOC offered a two-pronged argument in response. It first argued that TLC, through its relationship with Hamilton Pointe, exercised sufficient control over the class members to be classified as a joint employer. It also submitted that the relationship between TLC and Hamilton Pointe justified the piercing of the corporate veil between the two entities.

---

[84] R.110-1 at 19.

[85] *Id.* at 20.

**1.**

The district court granted TLC's motion for summary judgment. First, it held that the EEOC had failed to raise a genuine issue of material fact as to whether TLC was a joint employer of the claimant-employees. The district court applied the five-factor test that we adopted in *Knight v. United Farm Bureau Mutual Insurance Co.*, 950 F.2d 377 (7th Cir. 1991). That approach requires a court to consider:

> (1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations.

*Id.* at 378–79 (citation omitted).

The district court determined that, although the EEOC contended that TLC exercised control over Hamilton Pointe employees, particularly over the decision to fire employees, the relevant deposition testimony demonstrated only that "TLC gave Hamilton Pointe administrators its input and recommendation on these types of employment decisions; it did not make them or otherwise control their outcome." *EEOC v. Vill. at Hamilton Pointe LLC*, No. 17-cv-00147, 2020 WL 1532112, at *4 (S.D. Ind. Mar. 31, 2020). In arriving at this conclusion, the district court stated that the issue was "best

addressed" by Ott's testimony that TLC Human Resources would advise the administrator at each stage of termination, with the Hamilton Pointe administrator retaining the ultimate authority to decide whether a firing would occur. *Id.* The district court concluded that "providing only input and recommendations does not establish the right to control an employee." *Id.* (citing *Nischan*, 865 F.3d at 929). The court further rejected the EEOC's argument that TLC paid the cost of Hamilton Pointe's operations. Under the parties' management agreement, noted the court, TLC billed Hamilton Pointe for the services TLC provided the facility, and Hamilton Pointe's members, not TLC, were responsible for its recapitalization. The district court then rejected the EEOC's contention that Hamilton Pointe's employee benefits ran through TLC because Hamilton Pointe paid for those benefits.

To determine whether an entity should be treated as a joint employer, we "employ an 'economic realities' test which is, in its essence, an application of general principles of agency law to the facts of the case." *Frey v. Coleman*, 903 F.3d 671, 676 (7th Cir. 2018) (citations omitted). The district court appropriately applied the five-factor *Knight* test to implement this approach. In this appeal, the EEOC contests the district court's analysis of three of those factors: (1) the extent of the employer's control and supervision over the worker; (3) responsibility for the costs of operation; and (4) method and form of payment and benefits.

We turn first to the issue of control. "The most important of [the *Knight*] factors is the ability to supervise and control the employees." *Johnson*, 892 F.3d at 905. "And of those control factors, the ability to hire and fire ranks as most significant." *Id.* In the EEOC's view, the district court erred in

determining TLC's control over the Hamilton Pointe administrators to be immaterial. As it sees the matter, control over the administrators gave TLC indirect control over the claimants. It relies on a decision of the United States Court of Appeals for the District of Columbia Circuit, in which that court wrote that "control exercised indirectly—such as through an intermediary—may be sufficient to establish joint-employer status." *Sanitary Truck Drivers v. NLRB*, 45 F.4th 38, 42 (D.C. Cir. 2022) (internal quotation marks and citation omitted). The EEOC further argues that the district court erred in concluding that there was no genuine issue of fact as to whether TLC offered only "input and recommendations" on Hamilton Pointe employment decisions. The EEOC points to the district court's finding that Ott's testimony "best addressed" the issue as a credibility finding.

In evaluating the EEOC's position, we cannot accept, as a threshold matter, the EEOC's characterization of Ott's deposition testimony as presenting a factual matter precluding summary judgment. As we understand the district court, it simply took the view that Ott's testimony provided a more thorough explanation of the relationship between the two entities. The EEOC also points to Ott's testimony that TLC's regional director holds the "most authority" over termination because the administrator is responsible to the regional director. In the Commission's view, this testimony supports a conclusion that TLC approval was required for termination. But this interpretation fails to account for the remainder of Ott's answer where he states that the decision should not be made by the management company. Although Malvern, the former administrator, explicitly stated that TLC's approval, rather than merely review, was required to terminate an employee, her tenure at Hamilton Pointe preceded the allegations in this

case.[86] Cates and Ott testified to the relationship between Hamilton Pointe and TLC during the period in which TLC would have accrued liability.

In arguing that the administrator's accountability to TLC creates an inference of TLC's control over hiring decisions, the EEOC also fails to account for the evidence that the department managers had hiring and firing power over the claimants. Even if the administrator were TLC's agent of indirect control, TLC's authority over the department managers would still be one level removed.

The EEOC's costs of operation argument is grounded in the structure of the management agreement. Based on the terms of that management agreement, TLC may experience a loss if the costs of its services exceed 6.5% of Hamilton Pointe's net revenue. However, based on these same terms, Hamilton Pointe could also "overpay" for TLC's services if Hamilton Pointe's revenues were strong. The EEOC has pointed to no evidence that the fees paid by Hamilton Pointe to TLC are consistently incongruous with the cost of TLC's services.

**2.**

The district court also was not persuaded by the EEOC's veil piercing argument. Because both TLC and Hamilton Pointe are Indiana entities, Indiana law governs the EEOC's argument that TLC has forfeited, in effect, its limited liability. *See Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 364 (7th Cir. 2016). The focus of Indiana's veil-piercing standard is

---

[86] The harassment claims which proceeded to trial concerned the period from February 1, 2015, to October 12, 2017.

"whether 'the corporate form was so ignored, controlled or manipulated that it was merely the instrumentality of another and that the misuse of the corporate form would constitute a fraud or promote injustice.'" *Id.* (quoting *Reed v. Reid*, 980 N.E.2d 277, 301 (Ind. 2012)). Indiana law places little stock in the alleged integration of entities. "The corporate veil is pierced, when it is pierced, not because the corporate group is integrated, [but] because it has neglected forms intended to protect creditors from being confused about whom they can look to for the payment of their claims." *Id.* (quoting *Papa v. Katy Indus., Inc.*, 166 F.3d 937, 943 (7th Cir. 1999)). In *Bridge*, we determined that the separateness of two entities should not be disregarded even though they had similar names and shared common owners, two directors, a website, an address for their tax returns, health-insurance benefit plans, a human resources employee, an accountant, and a payroll coordinator. *Id.* As we noted in *Bridge*, in Indiana, the separateness of corporate entities should be disregarded for an anti-discrimination claim and piercing only appropriate where:

> (1) the enterprise has purposely divided itself into smaller corporations to dodge requirements imposed by the anti-discrimination laws; (2) a creditor of one corporation could, by piercing the corporate veil, sue its affiliate; or (3) the affiliate directed the discriminatory act or practice of which the plaintiff complains.

*Id.* (citing *Papa*, 166 F.3d at 940–42 (7th Cir. 1999). The district court correctly determined that none of these conditions are present here.

**Conclusion**

In instructing the jury in this case, the district court said:

> In deciding the EEOC's claims, you should not
> concern yourselves with whether Hamilton
> Pointe's actions were wise, reasonable, or fair.
> Rather, your concern is only whether the EEOC
> has proved that Hamilton Pointe subjected one
> or more Claimants to race-based job assign-
> ments and/or subjected one or more Claimants
> to a hostile work environment because of their
> race.[87]

This point was certainly a salutary one to make to the jury.
It is also an important point for the reader of this opinion to
keep in mind. As presently constituted, the federal law gov-
erning racial harassment proscribes conduct that is so severe
or pervasive as to change the conditions of the victim's em-
ployment. It does not ensure that the worker will have wise
and skilled superiors with a sharply honed sense of social jus-
tice and a mastery of personnel management skills. We have
applied that existing law today. Our opinion constitutes,
however, no approval of the situations portrayed in the pages
of this record. Whether our legal norms ought to be tightened
or updated at the federal or state level to ensure a higher level
of civilization in our health care institutions is a pressing sub-
ject within the ken of our legislatures and regulatory agencies.

---

[87] R.290 at 25 (Instruction #22).

The judgment of the district court is affirmed.

AFFIRMED